**STATE**

v.

**Leo L. DELAURIER.**

**No. 84–76–C.A.**

Supreme Court of Rhode Island.

Feb. 21, 1985.

Dennis J. Roberts II, Atty. Gen., John E. Migliaccio, Asst. Atty. Gen., for plaintiff.

Mark L. Smith, Smith & Smith, Woonsocket, for defendant.

## OPINION

MURRAY, Justice.

On November 2, 1983, a private citizen residing in Woonsocket telephoned the Woonsocket police department and made a rather unusual report. She related to the police that her son had been playing with the dial on her AM radio and had tuned in to what appeared to be a man discussing the sale of drugs. It sounded as if the man was speaking on the telephone. Two detectives were dispatched to her house. Upon arrival, the detectives listened to the woman's AM radio, which had remained tuned to the same frequency, and heard what sounded like a telephone ringing. No one answered. The detectives reported their experience back to the station, whereupon Captain Francis J. Lynch ordered that the station's AM radio be taken to another location and monitored for illegal drug transactions.

The department's "standard every day AM radio" was monitored for the next several weeks and certain conversations were recorded on tape. According to Captain Lynch, the recorded conversations involved "the sale of marijuana, cocaine, gambling and prostitution." The defendant, Leo L. Delaurier, was identified as the owner of the phone that the police were monitoring by AM radio, and several members of the department recognized the voice as his. The department's radio picked up, and the police recorded, both incoming and outgoing calls from Delaurier's phone. The defendant was completely unaware that his phone conversations, which he has stipulated involved illegal activities, were being broadcast over the AM airwaves.

The explanation behind defendant's inadvertent broadcasts involved his "cordless telephone," a type of phone that has become popular over the last several years. Delaurier used a standard Radio Shack wireless telephone which operated, as do all such phones, by means of radio waves. When defendant spoke into his hand-held mobile unit, his voice was converted into radio waves and transmitted to a base unit, which in turn transmitted his voice to the receiving party. Transmission of defendant's voice from the base unit to the receiving party was accomplished by means of ordinary telephone transmission lines. Conversely, incoming callers' voices were transmitted through telephone lines to defendant's base unit, which then transmitted those voices to the hand-held mobile unit by means of radio waves. It was these radio waves, both incoming and outgoing, which were picked up by the police department's AM radio.

On December 16, 1983, an affidavit summarizing the results of the department's investigation was prepared by Captain Lynch and submitted to a District Court judge. Arrest and search warrants were issued and executed on that date. Delaurier was subsequently arrested and charged with conspiring to violate the Rhode Island Uniform Controlled Substances Act, G.L.

1956 (1982 Reenactment) chapter 28 of title 21. Further, the state charged that Delaurier had violated the conditions of bail bond set in pending cases and sought to revoke his bail. A bail-revocation hearing was held on December 28, 1983. The hearing justice, after hearing testimony centered largely on the recordings made by the Woonsocket police department, was

> "more than reasonably satisfied that Mr. Delaurier has broken the terms of his release. The recognizance requires him to keep the peace and be of good behavior, and needless to say, he's enjoined from breaking the law while he's on a bail bond. And I think the conversations which were overheard clearly show, at the very least, an agreement or conversations concerning agreement to do illegal things such as the delivery and acceptance of cocaine."

The defendant was found to be in violation of the conditions of bail set in the cases pending against him and ordered to be held without bail. He now appeals from that order,[1] setting forth two independent arguments. First, defendant claims that the listening to and recording of his telephone conversations was prohibited by law and therefore constituted inadmissible evidence at the bail-revocation hearing. Second, defendant claims that the judicial notice taken by the hearing justice that certain instructions were provided to defendant when he bought his phone constituted a denial of his right to confrontation.

We first consider defendant's motion, made at the bail-revocation hearing, to suppress the evidence generated through the monitoring and taping of his phone conversations. The defendant argues that the denial of this motion was in error. Before discussing the merits of this argument, we briefly set forth the statutory background upon which the motion must be premised.

■■■ We begin with the proposition that "evidence, even though illegally obtained, is admissible at a bail revocation hearing if it is factually reliable; in other words, such evidence may, where relevant and reliable, serve as the evidence required to 'reasonably satisfy that there [has] been a violation.'" *Bridges v. Superior Court*, 121 R.I. 101, 104, 396 A.2d 97, 99 (1978) (quoting *Mello v. Superior Court*, 117 R.I. 578, 587, 370 A.2d 1262, 1266 (1977)). The *Bridges* court came to this conclusion by balancing "the benefit of any possible increased deterrence of future police misconduct achieved by extension of the [exclusionary] rule [to bail revocation hearings] against the harm likely to result to society from that extension." *Id.* 121 R.I. at 107, 396 A.2d at 100. The court determined that applying the exclusionary rule to bail revocation hearings would result in only a negligible increase in deterrence of police misconduct. Weighed against the harm to the bail system if a violator were allowed to escape the consequences of his violation through use of the exclusionary rule, the *Bridges* court decided that extension of the

1. On March 22, 1984, defendant moved the Superior Court to set bail on the ground that ninety days had elapsed between the time of his incarceration for bail violation and trial on the charge upon which bail was revoked. *Bridges v. Superior Court*, 121 R.I. 101, 109–10, 396 A.2d 97, 102 (1978). That motion was granted on March 29, 1984 and defendant was released on bail. His allegations of error regarding the bail revocation hearing are therefore moot, since he was subsequently granted bail notwithstanding the alleged error in the original bail-revocation hearing. Because of the importance of the issues presented in this appeal, however, we reach the merits of defendant's argument. Several factors influence our decision to reach the merits of this case notwithstanding Delaurier's subsequent release on bail. Given the ninety-day fuse mandated by *Bridges*, and the typically more attenuated process of appeal, the admissibility of evidence at bail-revocation hearings is likely to be a repetitious issue that evades appellate review. *School Committee v. Westerly Teachers Association*, 111 R.I. 96, 98, 299 A.2d 441, 443 (1973), and cases cited therein. Moreover, we perceive the question of the legality of the recordings an issue of substantial public interest. *Id.* Finally, given the fact that several other persons were arrested and charged as a result of the investigation in question, our opinion here should provide guidance to the Superior Court when facing similar issues arising out of the same investigation.

exclusionary rule to bail-revocation hearings was unwarranted. We reaffirm that holding today. The exclusionary rule simply does not apply to bail-revocation hearings.[2] There has been no argument that the recordings are factually unreliable. Thus, even granting that the recordings and the evidence generated therefrom were illegally obtained, such evidence was properly admissible under Rhode Island law at defendant's bail-revocation hearing. Recognizing this fact, defendant accordingly turns to federal law for assistance.

Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C.A. §§ 2510 through 2520 (1970) (title III), sets forth a comprehensive federal scheme regulating the use of certain "electronic, mechanical, or other devices" for purposes of eavesdropping on the wire or oral communications of others. Title III was enacted to counter what Congress perceived to be the increasing threats to privacy resulting from the use of sophisticated electronic devices, and to remedy the inadequacy of the limited prohibitions contained in the early communications act, 47 U.S.C.A. § 605 (1962). *United States v. Carroll*, 332 F.Supp. 1299 (D.D.C.1971). Title III's purpose has been described as twofold: (1) to protect the privacy of oral and wire communications, and (2) to provide, on a uniform basis, the circumstances and conditions under which interception of such communications would be allowed. *United States v. Cianfrani*, 573 F.2d 835, 855 (3rd Cir.1978). The latter goal is accomplished by extending the scope of its authority to both federal and state courts. 18 U.S.C.A. § 2515. We thus turn to the provisions of Title III to determine whether the monitoring and taping of defendant's phone conversations, unwittingly broadcast over the AM airwaves, was in violation of federal law. A review of those provisions is therefore in order.

■    It is undisputed that §§ 2516 through 2519, which set forth a procedure for obtaining judicial authority prior to the interception of wire or oral communications, were not complied with. Noncompliance with those sections would bar the use of protected communications at defendant's bail-revocation hearing, because title III's exclusionary rule is broader in scope than the Rhode Island exclusionary rule discussed above. It states that

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter." 18 U.S.C.A. § 2515.

The above provision applies to "any trial, hearing or other proceeding" and thus is applicable to the bail-revocation hearing in question.

The question before us, then, is whether defendant's communications were protected "wire" or "oral" communications and, if so, whether they were "intercepted" by the Woonsocket police department. To determine this, we turn to the definitional section of title III.

■    The term "wire communication" is defined by title III as

"any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the

---

**2.** Rhode Island statutory law bolsters this conclusion. "In the *trial of any action* * * * no evidence shall be admissible where the same shall have been procured by * * * any illegal search and seizure * * *." (Emphasis added.) G.L.1956 (1969 Reenactment) § 9–19–25. By its own terms, § 9–19–25 applies only to trials, and a bail revocation hearing is in no sense a "trial." *Bridges v. Superior Court*, 121 R.I. at 108 n. 7, 396 A.2d at 101 n. 7; *State v. Spratt*, 120 R.I. 192, 386 A.2d 1094 (1978).

point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications." 18 U.S.C.A. § 2510(1).[3]

At least three courts have considered whether communication over a telephone device utilizing radio waves is a "wire communication" within the meaning given that term above. Two of those courts have concluded that the term does not encompass such radio-assisted communications, while the third reluctantly concluded that the definition given by Congress left no choice but to hold that such communications were protected by title III. *See United ed States v. Hall*, 488 F.2d 193, 196–97 (9th Cir.1973) (communications between radiotelephone and land-line telephone are "wire communications" within meaning of title III); *Dorsey v. State*, 402 So.2d 1178, 1183–84 (Fla.1981) ("beeper messages" not "wire communications" within meaning of title III); *State v. Howard*, 235 Kan. 236, 679 P.2d 197, 204 (1984) (cordless telephone communications not "wire communications" within meaning of title III). After a careful review of the provisions of title III, as well as the relevant case law, we are of the opinion that defendant's inadvertent broadcasts were not "wire communications" within the meaning of that title. Thus, the Woonsocket police department was not required to comply with the provisions of § 2516 through 2519 prior to monitoring those broadcasts. To hold otherwise would, we believe, lead to what the *Hall* court itself characterized as an "absurd result." *United States v. Hall*, 488 F.2d at 197.

We recognize that § 2510(1) includes within its ambit communications made "in whole *or in part* \* \* \* by aid of wire" and

that defendant's cordless-phone communications were accomplished at least partially through use of telephone-transmission wires. But the communications broadcast over the AM airwaves were the result of the generation of radio waves by defendant's hand-held mobile unit and base unit. The transmission lines played a part only in that they carried signals to or from the base unit. These signals were not interferred with. Had they been, this would have been just the type of conduct title III guards against. In stark contrast, the police department here simply listened to conversations generated and broadcast on the public airwaves by defendant himself.

▬ Our conclusion that the communications received over the AM radio were not "wire communications" is the result of something more than a mere mechanical application of the statutory definition of that term. As the instant situation illustrates, that definition is not free of ambiguity. Reasonable minds could differ as to whether the term "wire communication," standing alone, encompasses the instant factual setting. The three cases cited above demonstrate this. But the term cannot be viewed in a vacuum, and our function is not limited to an unthinking determination of whether certain factual patterns fit within certain words. It is a maxim of statutory construction that this court is duty bound to ascertain the intent behind a legislative enactment and to give effect to that intent. *Vaudreuil v. Nelson Engineering and Construction Co., Inc.*, 121 R.I. 418, 420, 399 A.2d 1220, 1222 (1979). Of course statutory definitions are themselves an indication of legislative intent, and this court will ordinarily give strict meaning to those definitions. *Town of Scituate v. O'Rourke*, 103 R.I. 499, 512, 239 A.2d 176, 184 (1968). However, we will not

---

**3.** Rhode Island law contains a virtually identical definition:

"The term 'wire communications' means any communications made in whole or in part through the use of facilities for the transmission of communication by the aid of wire, cable, or other like connection between the point of origin and the point of reception, furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of communications." G.L.1956 (1981 Reenactment) § 12–5.1–1(a).

construe a statute to achieve an absurd result. *Beaudoin v. Petit,* 122 R.I. 469, 476, 409 A.2d 536, 540 (1979). It follows that if a mechanical application of a statutory definition produces an absurd result or defeats legislative intent, this court will look beyond mere semantics and give effect to the purpose of the act. *See C-Line, Inc. v. United States,* 376 F.Supp. 1043 (D.R.I. 1974).

The effect of defining defendant's broadcasts as "wire communications" would produce two results, both of which we find to be contrary to the intentions of title III. The first would be that law-enforcement authorities would find it necessary to obtain a court order to listen to the AM radio. 18 U.S.C.A. § 2516. Congress clearly did not intend such a result. Second, and perhaps more absurdly, the failure to obtain such an order could conceivably lead to liability for both civil and criminal sanctions. 18 U.S.C.A. §§ 2511, 2520. Thus, the citizen who reported defendant's communications to the police could be subject to criminal prosecution as well as a civil lawsuit, as could the Woonsocket police department and its officers who participated in the investigation. We cannot accept this result. The defendant's conversations were not "wire communications" within the meaning of title III.

Title III also prohibits the unauthorized interception of "oral communications," which are defined as

> "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation[.]" 18 U.S.C.A. § 2510(2).

■ This definition was written shortly after the decision of the Supreme Court of the United States in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and was intended to be interpreted in accordance with the principles enunciated in *Katz. See* S. Rep. No. 1097, 90th Cong.2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News 2178. In order for a communication to be protected under *Katz,* there must have been a subjective expectation of privacy. We will grant defendant this. But that expectation must have been *justifiable* as well. *Katz,* 389 U.S. at 352, 88 S.Ct. at 512, 19 L.Ed.2d at 582; 18 U.S.C.A. § 2510(2). The hearing justice found, and we agree, that defendant could have had no justifiable expectation that his broadcasts were confidential. The defendant was fully advised by the owner's manual that came with the phone, as was required by FCC regulations, that given the nature of the phone, privacy was not ensured.[4]

■ We need not concern ourselves, however, with a precise definition of what constitutes a justifiable expectation because our conclusion that title III has not been violated would remain unchanged even if we were to characterize defendant's broadcasts as "oral communications." In order to run afoul of title III, a communication must have been "intercepted" within the meaning of that title. The term "intercept" means "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C.A. § 2510(4). We do not believe that Congress intended to include within the meaning of "device" an ordinary, unadulterated AM radio. *See The United States Courts of Appeals: 1973–74 Term Criminal Law and Procedure,* 63 Geo.L.J. 325, 333, 351 (1974) (annual survey of criminal law and procedure). We reach this conclusion relying upon the same precepts of statutory construction discussed earlier. Title III simply was not intended to prevent anyone from listening to an AM broadcast, put on the air voluntarily, and accessible by anyone possessing an ordinary AM radio. Because of our conclusion that the term "de-

---

**4.** We emphasize that we are addressing *defendant's* expectation of privacy. Incoming callers, who may have been without knowledge that they were communicating through a cordless phone, may well have been justified in expecting privacy.

vice" does not include a standard AM radio, defendant's argument concerning his right to confrontation becomes moot, since evidence concerning his expectation of privacy (and thus his access to an owner's manual) is irrelevant. Even if defendant's conversations were "oral communications," they were not "intercepted" within the meaning of title III.

The defendant has put forth an imaginative argument by taking advantage of title III's ambiguous language and inartful drafting. If analyzed in a vacuum, the argument seemingly has merit. When viewed in light of the purposes of title III, however, the argument flies in the face of common sense and justice.

The defendant's appeal is denied and dismissed, and the decision of the Superior Court is affirmed.