John C. KAYA

v.

John J. PARTINGTON et al.

No. 94–523–Appeal.

Supreme Court of Rhode Island.

Aug. 1, 1996.

Stephen E. Breggia, Providence, for Plaintiff.

Richard G. Riendeau, Catherine E. Graziano, Providence, for Defendant.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on the appeal of the plaintiff, John C. Kaya (Kaya), from a summary judgment entered in the Superior Court in favor of the defendants, the city of

Providence; John J. Partington, commissioner of public safety for the city of Providence; Colonel Bernard E. Gannon, chief of the Providence police department; and Stephen T. Napolitano, treasurer of the city of Providence. We affirm the summary judgment in favor of the city of Providence and all other defendants. The facts of the case insofar as pertinent to this appeal are as follows.

On May 2, 1993, plaintiff, a thirteen-year veteran of the Providence police department who had attained the rank of sergeant, was injured by an unknown assailant while attempting to make an arrest. The plaintiff was dispatched to an area opposite 187 Benefit Street in Providence's East Side along with several other police officers when Rhode Island School of Design (RISD) security officers requested assistance from the Providence police department. A group of several hundred young people was gathered around a bonfire, singing and chanting, near the entrance to an abandoned railroad tunnel located in the area. The police had reason to believe that these youths, most of whom were costumed and several of whom were filming the event, were participating in a "satanic ritual." Upon arriving at the scene the police, including plaintiff, attempted to disperse the group. The crowd grew hostile and violent. The situation became unruly, with many in the crowd shouting obscenities and throwing debris at the officers. In the midst of this melee, several of the officers were seriously injured, including Kaya, who was struck in the face with a chunk of asphalt while attempting to arrest a female participant.

In accordance with G.L.1956 chapter 19 of title 45, and predicated on his work-related injury, plaintiff received "injured-on-duty" (IOD) benefits. The plaintiff was released by his physician and has returned to the full performance of his duties as a police officer.

Kaya subsequently brought this action for damages, claiming that defendants negligently failed to provide him, as well as other ranking officers on the scene, with blue

shirts as part of their uniforms, as opposed to the white shirts issued. Kaya alleges that his white shirt made him a "more susceptible and likely target of violent assault" and that he was "specially targeted for such assault by virtue of his uniform." [1] In addition, plaintiff alleges that he did not have any protective riot gear at the time he approached the disturbance and subsequently sustained his injuries. Kaya specifically contends that defendants acted negligently, willfully, and intentionally by failing to provide a blue shirt and riot gear.

The defendants' motion for summary judgment was granted. The plaintiff filed a timely appeal and contends that the trial justice erred in granting defendants' motion for summary judgment. We disagree.

The issue presented in this case is whether a police officer can maintain an action in tort against a municipality and his or her superior officers for injuries sustained in the course of his or her employment and whether IOD benefits constitute the exclusive remedy of a police officer injured in the line of duty.

■ Police officers in Rhode Island are statutorily entitled to compensation for injuries incurred in the performance of their duties. General Laws 1956 chapter 19 of title 45 entitled, "Relief of Injured and Deceased Fire Fighters and Police Officers," provides for such compensation and benefits. This statute automatically triggers IOD benefits upon the occurrence of a line-of-duty illness or injury without requiring the police officer to show fault on the part of the respective city, town, fire district, or state. *Labbadia v. State,* 513 A.2d 18, 21 (R.I.1986). The IOD statute provides that any police officer in Rhode Island who is injured in the performance of his or her duties may recover the benefits under the statutory scheme. Section 45–19–1(a). These benefits include a mandate for payment of medical and related expenses for police officers injured in the line of duty as well as the full salary to which they would be entitled had they not been so incapacitated. *Id.* In addition, the statute

---

1. Having attained the rank of sergeant, plaintiff was required to wear as part of his official uniform a white shirt, distinguishing him as a superior officer among fellow police officers at the

scene who were all in blue. A police report filed by RISD security officers alleges that several students in the crowd were heard to shout, "Get the * * * in the white shirts, they're in charge."

provides that all such medical expenses related to this injury will be covered if he or she retires in a disabled condition as a result of the injury and he or she suffers a recurrence of the injury that caused his or her retirement. *Id.* Section 45–19–1(b) provides that "the term 'police officer' shall mean and include any chief or other member of the police department of any city or town regularly employed at a fixed salary or wage."

■ Section 45–19–1 is a separate and distinct compensation statute from the Workers' Compensation Act (WCA) which originally covered police officers.[2] Section 45–19–1 is unlike the WCA in that it requires that their full salaries be paid to police officers by the municipality that employs them. Under the WCA injured workers receive only a percentage of their salaries, G.L.1956 § 28–33–17, and coverage under the WCA is optional on the part of the individual employee, G.L.1956 § 28–29–17. Furthermore, when an employee elects coverage under the WCA, he or she is deemed to have waived his or her common-law rights against the employer and its employees, officers, directors, and agents. *Boucher v. McGovern,* 639 A.2d 1369, 1375 (R.I.1994) (exclusive-remedy provision of WCA immunized driver, as coemployee of passenger, from claims for contribution or indemnity).

■ In contrast the IOD statute is not optional. It is a mandatory compensation act and must be complied with as the exclusive remedy provided to police officers who become ill or injured in the line of duty. It presents no alternative legal course of action to the police officer with respect to the city or the town that employs that officer. Section 45–19–1.1 establishes a means for reimbursement to the city or the town of the above moneys expended only when the injury or the sickness of the officer "was caused under circumstances creating a legal liability in some person other than the employer." However, the IOD statute does not preclude an officer from seeking recovery of damages, including compensation for pain and suffering, from a third party. Those rights remain intact. It is notable that § 45–19–1 does not provide for such compensation payments by the municipality to the officer.

There have been several amendments since the original enactment in 1944 of § 45–19–1, which then only required municipalities to pay police officers incapacitated during the performance of their duties for the duration of the incapacity. Included among these were changes allowing for other categories of public-safety employees to receive these injury benefits. For example, crash-rescue crewmembers having been previously covered by the WCA were added in 1972 with the enactment of P.L.1972, ch. 212, § 1. *Labbadia,* 513 A.2d at 20. In *Labbadia,* this court addressed Labbadia's attempt to recover both under the IOD and the WCA. *Id.* at 20. Labbadia, a crash-rescue crewmember, sought double compensation because it appeared that when the Legislature provided for members of his occupation to be included under § 45–19–1, it did not specifically exclude them from § 28–29–2. *Labbadia,* 513 A.2d at 22. In denying Labbadia's appeal, this court recognized that the change of remedies for crash-rescue crewmembers "enhanced the rights and remedies of crash-rescue crewmembers injured in the line of duty." *Id.* at 21. In *Labbadia* we stated that "[s]ection 45–19–1 was intended to provide greater work-related injury benefits to certain public employees whose jobs require them to serve the state or its municipalities, often in dangerous situations." 513 A.2d at 21. This court went on to explain the impact of this statute on those categories of workers who assume the risk of harm every single work day by the very nature of their employment. Specifically, we stated:

"This provision gives police officers, firefighters, and crash-rescue crewmembers greater rights than they would have under either common law (where, for instance,

---

**2.** The WCA was first enacted in 1912. At that time police officers were *not* excluded from the definition of "employee." *Labbadia v. State,* 513 A.2d 18, 20 (R.I.1986) (citing P.L.1912, ch. 831, art. 5, § 1). In 1917 the Legislature specifically excluded them. *Id.* (citing P.L.1917, ch. 1534,

§ 5). It was not until 1944 that police officers became statutorily entitled to benefits for incapacitation during the course of performing their duties via legislation that has evolved through a series of amendments to become the present-day G.L.1956 § 45–19–1. 513 A.2d at 20.

they would have to show fault on the part of the employer as well as overcome certain defenses) or the WCA (where, even though the employee is relieved from proving fault, the employee receives only the percentage of salary provided in G.L.1956 (1979 Reenactment) § 28–33–17)." *Labbadia*, 513 A.2d at 21.

We hold that § 45–19–1 is the exclusive remedy for police officers injured in the line of duty with *respect to their employers*. The IOD remedy, like workers' compensation benefits, allows a recovery without showing of fault and is not subject to the various tort defenses (contributory negligence, assumption of the risk, lack of foreseeability, lack of a duty or breach of a duty, lack of notice, and intervening causes) that would be available to any alleged tortfeasor, including a municipality, to defeat the claims of a police officer seeking damages under the State Tort Claims Act. (G.L.1956 chapter 31 of title 9). It is noteworthy that Kaya was injured as a direct result of an intentional battery by an unknown assailant. Even if a negligence ·claim against the city could be established by Kaya, the city's negligence would arguably constitute a remote cause of his injury. However, none of the defenses listed above would be available to the city under the IOD statute to defeat such a claim. However, plaintiff is not precluded by the IOD from bringing suit against the intentional tortfeasor.

The plaintiff makes much of the exclusivity provision of the WCA and the absence of such an explicit provision in the IOD statute. The WCA was established to provide expeditious relief to injured workers under a no-fault system of benefits replacing a cumbersome and often lengthy tort system. *Labbadia*, 513 A.2d at 21. The specific legislative intent was to establish the WCA as the exclusive remedy available to injured workers, completely replacing all other remedies then available. *Id.* Section 28–29–20, the exclusivity provision of the WCA, states:

"The right to compensation for an injury under chapters 29—38 of this title, and the remedy therefor granted by those chapters, shall be in lieu of all rights and remedies as to that injury now existing, either at common law or otherwise against an employer, or its directors, officers, agents, or employees; and those rights and remedies shall not accrue to employees entitled to compensation under those chapters."

It is true that when adopted by the Legislature, the IOD statute contained no such exclusivity provision. However, as with the WCA, the remedy provided for in the IOD statute must be exclusive. Although the IOD statute is not explicit on this score, similar sound public policy requires that the exclusivity of the remedy should apply not only with respect to the employer but also with respect to fellow officers, superior officers, and officers of the municipal corporation. The individual defendants are entitled to judgment as a matter of law.

Our brother, Justice Flanders, in a very vigorous dissenting opinion, suggests that this court should not engage in interstitial amendment to the IOD statute by engrafting thereon an exclusivity provision similar to that contained in the WCA.

We have already adverted to our decision in *Labbadia v. State*, in which we held that by including crash-rescue crewmembers within the benefits of the IOD statute, the Legislature impliedly excluded them from the WCA. In construing a statute, it is our obligation "to ascertain the intent behind [the] legislative enactment and to give effect to that intent." *State v. Delaurier*, 488 A.2d 688, 693 (R.I.1985). In giving effect to legislative intent, we may depart from a mechanical application of statutory language or definitions, particularly in the event that application of mere semantics will defeat the purpose of the act. *Id.* at 693–94.

At the time the IOD statute was adopted, police officers and firefighters had no effective right of action against their state or municipal employers because of sovereign immunity. Any right of action that they might have· against persons whose conduct inflicted negligent injury upon them would have been gravely circumscribed by the firefighters'/police officers' rule. *See, e.g., Smith v. Tully*, 665 A.2d 1333 (R.I.1995); *Aetna*

*Casualty & Surety Co. v. Vierra,* 619 A.2d 436 (R.I.1993); *Mignone v. Fieldcrest Mills,* 556 A.2d 35 (R.I.1989); *Roberts v. Rosenblatt,* 146 Conn. 110, 148 A.2d 142 (1959); *Wilson v. Florida Processing Co.,* 368 So.2d 609 (Fla.Dist.Ct.App.1979); *England v. Tasker,* 129 N.H. 467, 529 A.2d 938 (1987).

■ The IOD statute and the WCA are similar statutes, and though not identical in their provisions, the two are designed to achieve similar goals. In construing the provisions of statutes that relate to the same or to similar subject matter, the court should attempt to harmonize each statute with the other so as to be consistent with their general objective scope. *State v. Ahmadjian,* 438 A.2d 1070, 1081 (R.I.1981). "'This rule of construction applies even though the statutes in question [may] contain no reference to each other and [even though they] are passed at different times.'" *Blanchette v. Stone,* 591 A.2d 785, 786 (R.I.1991).

In our opinion it would create a result not intended by the Legislature for this court to hold that in addition to IOD benefits, police officers, firefighters, and crash-rescue crewmembers should have a right to sue their municipal and/or state employers. It would be productive of near chaos if we should recognize a right of action for police officers, firefighters, and crash-rescue crewmembers to sue their superior officers and fellow employees. In a paramilitary organization nothing could be more detrimental to good order and discipline than the encouragement of civil actions by police, fire, and emergency personnel against their employers and their superior officers arising out of perceived shortcomings in preparing them for dangerous circumstances that they must encounter on a daily basis.[3] It is for this reason, in our opinion, that IOD legislation was originally adopted as an exclusive substitute for the speculative rights of action that they might have had against their employers and the community whose members they serve. This court will not construe a statute to reach an absurd result. *Beaudoin v. Petit,* 122 R.I. 469, 476, 409 A.2d 536, 540 (1979). In *Krikorian v. Rhode Island Department of Human Services,* 606 A.2d 671 (R.I.1992), this court, in construing Rhode Island's Equal Access to Justice Act, determined that a nonprofit legal agency that represented a plaintiff in seeking medical-assistance benefits was entitled to a counsel fee even though the plaintiff had not incurred out-of-pocket expenses and had not compensated the agency for its services and legal assistance. The literal terms of the statute G.L.1956 § 42–92–3 provided that "[t]he adjudicative officer shall award to a prevailing party reasonable litigation expenses incurred by the party in connection with that proceeding." *See Krikorian,* 606 A.2d at 674. It was therefore argued that counsel fees should not be awarded in this instance to the nonprofit agency. This court responded as follows:

"It is a well-settled principle in this jurisdiction that this court is the final arbiter on questions of statutory construction. * * * In construing a statute, this court attempts to ascertain the intent of the Legislature by considering the act in its entirety and by viewing it in light of circumstances and purposes that motivated its passage. Legislative intent is determined 'through an examination of the language of the statute itself, giving the words of the statute their plain and ordinary meaning.' * * * However, we shall not construe a statute in such a way as to violate the intent of the Legislature in enacting the statute.

"* * *

**3.** The dissent quotes Tennyson's immortal "Charge of the Light Brigade." We are all repelled by the acts of the blundering commander or commanders who permitted the Light Brigade to charge to its doom in the face of Russia's cannons. However, if sovereign immunity (a judicially devised rule of policy) had not barred British troops from bringing suit against their superior officers or the Crown itself, it may well have been that Britain and France would not have achieved victory in the Crimean War. It should also be noted that if General MacArthur had been called to account before one or more juries for his manner of conducting the Philippine defense at the beginning of World War II, he might not have been available to lead the Allied Forces in their triumphal return to Manila. It should also be considered, at least in passing, that if General Eisenhower had faced possible actions for damages, he might never have dared to order the Allied troops to invade Normandy in June of 1944.

"Furthermore, when we consider the act in its entirety and view it in light of circumstances and purposes that motivated its passage, the only meaningful construction we discern is that the Legislature intended for attorney's fee awards to be available to those attorneys or organizations that represent prevailing litigants who do not incur any out-of-pocket expenses." *Krikorian,* 606 A.2d at 675.

A court need not lie supine in the face of legislative silence or ambiguity. Although members of the Supreme Court of the United States have spoken eloquently about strict statutory construction, it is notable that in *D.A. Schulte, Inc. v. Gangi,* 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114 (1946), the majority of the Court in an opinion by Justice Reed interpreted the Fair Labor Standards Act (which was silent on the subject) to preclude a compromise between an employee and an employer that diminished the employee's recovery of liquidated damages on a claim for overtime compensation.

The Supreme Court of this State in *Capobianco v. United Wire & Supply Corp.,* 77 R.I. 474, 77 A.2d 534 (1950), in construing the then-existing workmen's compensation statute, filled in a gap that was necessary to authorize the Superior Court to hear and determine allegations of fraud or coercion in the procurement of an agreement prior to an appeal to this court. In commenting upon its construction of the statute to supply the missing element, we made the following comment:

"It would seem that we have here a classic instance of a legislative oversight which has resulted in an unintended gap in the statutory provision prescribing the procedure necessary to be followed in order to obtain a *decision* from which an appeal in its true sense could be taken to the superior court within the time limited by § 4. This being so it is not only the right but the duty of this court to fill in such gap so that the purpose of the act may be effectively carried out and so that appellate procedure thereunder may be made clear and definite. Only legislative direction to the contrary could bar judicial action in the premises. We are restrained by no legislative direction of that nature." *Id.* at 482–83, 77 A.2d at 538.

During the present century the Supreme Court of the United States and other courts have resolved the most controversial issues by judicial decision in the face of legislative inaction. *See, e.g., Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (one person, one vote); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (adoption of the exclusionary rule); *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (ending segregation by race in the public schools); *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925) (wherein the Court construed the First Amendment (beginning *"Congress* shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press") to be applicable to the states as well through the medium of the due-process clause of the Fourteenth Amendment). The foregoing cases are simply a few examples of the forging of policy from the magnificent generalities contained in the Bill of Rights. Compared to the foregoing sweeping assertions of policy, our modest attempt to harmonize the provisions of the IOD statute and the WCA would be well within the area of a restrained judicial function.

For the reasons stated, the appeal of the plaintiff is denied and dismissed. The summary judgment entered in the Superior Court is affirmed. The papers in the case may be remanded to the Superior Court.

FLANDERS, Justice, dissenting.

This appeal requires us to determine whether a statutory-benefit scheme for injured police officers and firefighters is the only relief available to such persons against their municipal employers and other governmental tortfeasors for any on-the-job injuries they sustain because of alleged misconduct by their employers or by other governmental wrongdoers. Because I believe this question should be answered in the negative, I respectfully dissent from the majority's opinion.

It may well be, as the majority concludes, that there are sound public policy reasons why the limited benefits provided to injured and deceased firefighters and police officers under G.L.1956 § 45–19–1 (the so-called injured-on-duty or IOD statute) should be deemed to be the exclusive remedy available to such employees against their municipal employers for on-the-job injuries that they suffer because of alleged tortious misconduct by governmental miscreants. Indeed, as the majority declares, it may well be that "sound public policy requires that the exclusivity of the remedy should apply not only with respect to the employer but also with respect to fellow officers, superior officers, and officers of the municipal corporation."

On the other hand, it might also be "sound public policy" to conclude otherwise: that restricting injured police officers and firefighters to recovering only their lost wages and medical expenses from municipal tortfeasors—while depriving them of any right they might otherwise have to sue any and all governmental wrongdoers in tort for damages attributable to their pain and suffering, scarring or other permanent injuries, emotional distress, loss of enjoyment of life or reduced life expectancy, loss of consortium, humiliation, punitive damages, and the other types of consequential damages and monetary relief potentially available to the victims of tortious misconduct [4]—is far too harsh and unjustifiable a result in this post-sovereign-immunity era,[5] especially when, as here, there are allegations of intentional misconduct and at least some evidence that the municipality was notified in advance about the alleged protective gear and uniform deficiencies that purportedly contributed to this plaintiff's injuries.

Without citing any evidence to support its conclusion, the majority claims that it would "create a result not intended by the Legislature" to allow public-safety officers to sue their governmental employers for tortious misconduct that injures them and warns that it would be "productive of near chaos" if such suits could be filed against their superior officers and fellow employees because "[i]n a paramilitary organization nothing could be more detrimental to good order and disci-

---

4. *See, e.g., Arlan v. Cervini*, 478 A.2d 976, 980 (R.I.1984) (mental suffering arising from consciousness of a disfiguring mark is a compensable element of damages); *Shanley v. Miletta*, 93 R.I. 98, 103–04, 171 A.2d 437, 439–40 (1961) (upholding award of damages for pain and suffering, future treatment of injuries, permanent injuries, and punitive damages); *Simone v. The Rhode Island Co.*, 28 R.I. 186, 204, 66 A. 202, 209 (1907) (upholding damages for fright where physical injury results); *see also* G.L.1956 § 9–1–41(a) ("[a] married person is entitled to recover damages for loss of consortium caused by tortious injury to his or her spouse").

5. In *Becker v. Beaudoin*, 106 R.I. 562, 571–72, 261 A.2d 896, 901–02 (1970), this court abrogated the doctrine of sovereign immunity that previously protected municipalities from claims based on alleged tortious wrongdoing. Following the *Becker* decision, the General Assembly enacted the Rhode Island Tort Claims Act, G.L.1956 chapter 31 of title 9. The act provided that cities, towns, and other governmental units shall be "liable in all actions of tort in the same manner as a private individual or corporation," § 9–31–1, except that damages cannot exceed $100,000 unless the city or the town was engaged in a proprietary function when it committed the alleged tort. Section 9–31–3. Thus, subject to the applicability of certain other potential defenses (such as the public-duty doctrine), the state and its municipalities, like all other employers, are now "liable in all actions of tort in the same manner as a private individual or corporation" in matters involving public employees like this police-officer plaintiff.

At common law, a Rhode Island employer owed to its employees the duty to provide and maintain a reasonably safe work environment; to provide whatever appliances, tools, and equipment that the employee needed to do his or her job safely; to provide a sufficient number of suitable and competent fellow employees to permit safe performance of the work; to warn employees of unusual or nonobvious hazards; and to make and enforce safety rules. *See Faltinali v. Great Atlantic & Pacific Tea Co.*, 55 R.I. 438, 444–45, 182 A. 605 608–09 (1936) (duty to provide reasonably safe workplace); *Connor v. White*, 41 R.I. 219, 223, 103 A. 561, 562 (1918) (employer must exercise reasonable care in the selection of an employee's fellow workers); *Savage v. Rhode Island Co.*, 28 R.I. 391, 401, 67 A. 633, 637 (1907) (company had duty to warn employee of hidden or extraordinary dangers and instruct him or her with respect thereto); *Laporte v. Cook*, 21 R.I. 158, 160, 42 A. 519, 520 (1899) (employer has nondelegable duty to furnish proper tools to its employees). Thus, if an employer breached any of these obligations and in turn caused harm to its employee, the employee could seek redress by bringing a complaint against the employer for negligence at common law.

pline than the encouragement of [such] civil actions * * *." But we have no way of knowing whether the General Assembly ever had any intention whatsoever with respect to the issues raised by this lawsuit, much less what results it would have intended had it ever paused to consider these matters. In such circumstances, I would restrict the domain of the statute to cases anticipated by its framers and expressly resolved in the legislative process and hold it inapplicable to all other situations. *Accord* Frank H. Easterbrook, *Statutes' Domains,* 50 U. Chi. L.Rev. 533, 544 (1983) ("Unless the party relying on the statute could establish either express resolution or creation of the common law power of revision, the court [should] hold the matter in question outside the statute's domain. The statute would become irrelevant, the parties (and court) remitted to whatever other sources of law might be applicable.").

Nonetheless, I suppose that it is entirely possible that one or more of our state legislators—perhaps even a majority of them—who enacted the IOD statute in 1944 (P.L.1944, ch. 1479) or who amended it on numerous occasions thereafter (if they ever paused to consider this issue) might well have concluded that, as a matter of public policy, it would be better that minions maimed or slaughtered by the tortious commands of their paramilitary superiors should be denied access to our courts "for all injuries or wrongs which may be received in one's person," R.I. Const., art. 1, § 5, than that the perceived interests of "good order and discipline" should suffer by having governmental wrongdoers called to account before a jury for their alleged misconduct.

On the other hand, one or more of these same state legislators may have recalled the fate of the Light Brigade [6]—or envisioned the more infamous paradigms epitomized by twentieth century police-state regimes, militant militias (like Montana's Freemen), or the tinhorn tyranny with which some local constabularies have reputedly ruled their roosts—and wondered whether it might not be better, on occasion, to countenance some eventual day of reckoning in a court of law for those paramilitary protagonists of good order and discipline whose tortious misconduct causes unjustifiable injury to their subordinates and others—even at the dubious risk of tolerating conditions "productive of near chaos." For even when we are dealing with paramilitary organizations, good order and discipline are not the only stars in the social firmament; rather, they form just one constellation of values in an ever-expanding universe of competing interests. But the reality is, when, as here, a statute is silent on the subject at issue, we judges have absolutely no clue about what result the Legislature would have intended had it ever considered the question presented, especially when we depart from the text of a statute and attempt to find some hidden legislative design or intent that answers a problem not resolved by what the Legislature actually said.

"Because legislatures comprise many members, they do not have 'intents' or 'designs,' hidden yet discoverable. Each member may or may not have a design. The body as a whole, however, has only outcomes. It is not only impossible to reason from one statute to another but also impossible to reason from one or more sections of a statute to a problem not resolved.

" * * * *

" * * * [B]ecause control of the agenda and logrolling are accepted parts of the legislative process, a court has no justification for deciding cases as it thinks the legislature would in their absence." Easterbrook, 50 U. Chi. L.Rev. at 547–48.

In any event, whatever may be the allure of the majority's paean to the interests of good order and discipline within paramilitary organizations, in my opinion it would resonate more from the well of the Senate floor than from the bench of the Supreme Court.

---

6. " 'Forward, the Light Brigade!'
Was there a man dismay'd?
Not tho' the soldier knew
Some one had blunder'd.
Theirs not to make reply,
Theirs not to reason why,
Theirs but to do and die.
Into the valley of Death
Rode the six hundred."
Alfred Lord Tennyson, "The Charge of the Light Brigade" (Stanza II) (1854).

*See Dennis v. United States,* 341 U.S. 494, 525, 71 S.Ct. 857, 875, 95 L.Ed. 1137, 1160–61 (1951) (Frankfurter, J., concurring) ("But how are competing interests to be assessed? * * * [W]ho is to balance the relevant factors and ascertain which interest is in the circumstances to prevail? Full responsibility for the choice cannot be given to the courts. Courts are not representative bodies. They are not designed to be a good reflex of a democratic society.").

Moreover, in focusing on what results the Legislature may have intended in enacting the IOD statute, instead of on what the IOD statute means by what it says or fails to say, the majority is missing the mark. *See, e.g., Commissioner of Internal Revenue v. Acker,* 361 U.S. 87, 92–93, 80 S.Ct. 144, 147, 4 L.Ed.2d 127, 131 (1959) (legislative intent is ineffective unless embodied in statutory words). "We do not inquire what the legislature meant; we ask only what the statute means." Oliver Wendell Holmes, *The Theory of Legal Interpretation,* 12 Harv. L.Rev. 417, 419 (1899). Here, the IOD statute does not address the issue presented by this case. It is therefore inapplicable because it supplies no answer to the question at hand.

Denying police officers and firefighters any right to initiate litigation against their employers and superior officers for alleged tortious misconduct by these governmental wrongdoers also serves to eliminate one of the most potent forms of dissent and to eradicate one of the most effective means to check the abuse of privilege and power within the ranks of these organizations. The inevitable result will be to coerce compliance with pernicious orders and thoughtless commands that expose these employees to needless life-threatening risks and avoidable injuries like those suffered by this plaintiff. Without any legislative direction to do so, I am reluctant to start down that path because "[t]hose who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard." *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 641, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628, 1639 (1943).

Moreover, I cannot help but wonder whether it would "create a result not intended by the Legislature" to allow Sergeant Kaya to recover for the lost vision in his eye, for his pain and suffering, and for the permanent scars and disfigurement that he suffered at the hands of a rock-throwing mob if the evidence shows that he never would have sustained such injuries but for the negligence of his employer in failing to equip him properly. Or do we confound the goals of the IOD statute when we turn a deaf ear to a blinded police officer's plea to recover for all his injuries, despite our constitutional guaranty to him of "a certain remedy, by having recourse to the laws, for all injuries or wrongs which may be received in one's person"? R.I. Const., art. 1, § 5. And would it truly be productive of near chaos if any superior officer or officers within Sergeant Kaya's police department who are alleged to be guilty of tortious misconduct were required to answer in a court of law for their claimed wrongdoing? Or do we take one step away from the rule of law and nearer to chaos every time we depart from our proper role as judges and enact our own favored policies into law—notwithstanding the absence of any legislative or constitutional direction to do so? In my judgment, the sky would not fall, the reign of "near chaos" would be no nearer, and "good order and discipline" would not go by the board if this lawsuit and others like it were allowed to proceed so that injured police officers and firefighters could have their day in court against municipal tortfeasors.

If good order and discipline within paramilitary organizations were all that mattered in these circumstances, it would, perhaps, be easier to swallow the majority's reasoning. Indeed, if I felt free as a judge to vote my own personal public-policy preferences, I might have little hesitation in siding with those who believe, like the majority, that an exclusive no-fault benefit scheme for injured-on-duty police officers and firefighters is a better way to accommodate the competing interests of all concerned than allowing such persons to sue their municipal employers and other governmental officials who allegedly caused or contributed to their injuries. Liberated from the usual constraints that apply

to the judicial task of statutory construction, I might strain long and hard to avoid the potentially divisive prospect of police officers and firefighters second-guessing the judgment calls of their superior officers and tying up municipal police and fire departments in expensive and time-consuming litigation about who should be blamed for causing them to suffer various on-the-job injuries.

But here is where I part company with the majority. I believe that these kinds of sound-public-policy determinations are best made by the Legislature and not by the courts. This is especially true when, as here, "[w]e have no authoritative indication that [the Legislature] wished such results, and it is quite another thing for us, in the absence of guidance from [the Legislature] to assume that it did." *Calmar Steamship Corp. v. United States,* 345 U.S. 446, 456, 73 S.Ct. 733, 738, 97 L.Ed. 1140, 1147 (1953). Whether the mere provision of certain legislated employment benefits should ipso facto destroy whatever rights an injured police officer or firefighter might otherwise have to sue alleged municipal wrongdoers for damages— and thereby become the injured worker's exclusive remedy against governmental tortfeasors—is a policy determination that is more properly to be made by the Legislature, which creates and bestows such benefits, and not by this court. Thus, I am loathe to construe legislative silence on this remedial exclusivity issue as a green light for this court to engage in judicial policy making, especially when such a decision to close the courthouse doors on these workers potentially implicates their constitutional rights of access to our courts "for all injuries or wrongs which may be received in one's person" and of having their right of trial by jury "remain inviolate." R.I. Const., art. 1, §§ 5, 15. Heretofore, there has been no "paramilitary organization" exception to the broad sweep of these clauses in our constitution or to the General Assembly's directive that municipalities are to be held "liable in *all* actions of tort in the same manner as a private individual or corporation." (Emphasis added.) Section 9–31–1.

To be sure, as the majority notes, "[a] court need not lie supine in the face of legis-

lative silence or ambiguity." But neither should it leap to its feet, exclaim that the Legislature has failed to address the question presented, and then abscond with its own take on what it thinks is best for the polity.

"Statutory construction is an art. Good statutory construction requires the rarest of skills. The judge must find clues in the structure of the statute, hints in the legislative history, and combine these with mastery of history, command of psychology, and sensitivity to nuance to divine how deceased legislators would have answered unasked questions.

" * * * The number of judges living at any time who can, with plausible claim to accuracy, 'think [themselves] ... into the minds of the enacting legislators and imagine how they would have wanted the statute applied to the case at bar,' may be counted on one hand.

"To deny that judges have the skills necessary to construe statutes well—at least when construction involves filling gaps in the statutes rather than settling the rare case that arises from conflicts in the rules actually laid down—is *not* to say that stupid and irresponsible judges can twist any rule. Doubtless the 'judge's role should be limited, to protect against willful judges who lack humility and self-restraint.' Yet there is a more general reason for limiting the scope of judicial discretion. Few of the best-intentioned, most humble, and most restrained among us have the skills necessary to learn the temper of times before our births, to assume the identity of people we have never met, and to know how * * * disparate characters from regions of great political and economic diversity would have answered questions that never occurred to them. * * * After putting the impossible to one side, though, a judge must choose from among the possible solutions, and here human ingenuity is bound to fail, often. When it fails, *even the best intentioned will find that the imagined dialogues of departed legislators have much in common with their own conceptions of the good.*" (Second emphasis added.) Easterbrook, 50 U. Chi. L.Rev. at 550–51.

Moreover, the IOD legislation providing such no-fault benefits to injured firefighters and police officers contains no exclusivity or waiver provisions like those found in the Workers' Compensation Act (WCA) (which expressly exempts firefighters and police officers from its coverage) that would bar a tort action brought by an injured police officer or firefighter against his or her municipal employer or other governmental tortfeasor.[7] Nor would the General Assembly's provision of such no-fault IOD benefits be inconsistent with also allowing injured police officers or firefighters to maintain independent tort actions to recover damages for their pain and suffering, disfigurement, and other debilitating injuries allegedly caused by governmental wrongdoers, provided that the elements of such a claim can be established, that appropriate credit is given for any IOD benefits already paid and received (to avoid double compensation), and that any other applicable defenses can be overcome.

Nonetheless, the majority decrees that, in regard to municipal employers and other alleged governmental tortfeasors, the IOD statute is "the exclusive remedy for police officers injured in the line of duty" and claims—without citing any evidence to support its assertion—that it "was originally adopted as an *exclusive* substitute for the speculative rights of actions that they might have had against their employers and the community whose members they serve." (Emphasis added.) However, there is absolutely nothing in this statute or elsewhere that so states, and the majority fails to provide any rationale whatsoever for its naked conclusions about the putative exclusivity of the IOD statute. "For purposes of judicial enforcement, the 'policy' of a statute should be drawn out of its terms, as nourished by their proper environment, and not, like nitrogen, out of the air." *D.A. Schulte, Inc. v. Gangi,* 328 U.S. 108, 121–22, 66 S.Ct. 925, 931–32, 90 L.Ed. 1114, 1122 (1946) (Frankfurter, J., dissenting). Our goal is to construe the statute as it is written and not to divine sound public policy out of legislative silence, references to imagined legislative intentions, or our own predilections. As Justice Frankfurter once warned, "The search for significance in the silence of [the Legislature] is too often the pursuit of a mirage. We must be wary against interpolating our notions of policy in the interstices of legislative provisions." *Scripps–Howard Radio, Inc. v. Federal Communications Commission,* 316 U.S. 4, 11, 62 S.Ct. 875, 880, 86 L.Ed. 1229, 1235 (1942).

The reason to be on guard is that when legislative silence is confronted, the temptation is omnipresent for judges to label any interpretation of that silence that embodies policies with which they disagree as "absurd" or "creat[ing] a result not intended by the

---

7. The WCA, in G.L.1956 § 28–29–20, entitled "Rights in lieu of other rights and remedies," provides in pertinent part:

"The right to compensation for an injury under chapters 29—38 of this title, and the remedy therefor granted by those chapters, shall be in lieu of all rights and remedies as to that injury now existing, either at common law or otherwise against an employer, or its directors, officers, agents, or employees; and those rights and remedies shall not accrue to employees entitled to compensation under those chapters while they are in effect, except as otherwise provided in §§ 28–36–10 and 28–36–15."

The WCA, in § 28–29–17, entitled "Waiver of common law rights—Notice of claim of common law right," further provides as follows:

"An employee of an employer subject to or who shall have elected to become subject to the provisions of chapters 29—38 of this title as provided in § 28–29–8 shall be held to have waived his right of action at common law to recover damages for personal injuries if he or she shall not have given his or her employer at the time of his or her contract of hire notice in writing that he or she claims that right and within ten (10) days thereafter has filed a copy thereof with the director, or, if the contract of hire was made before the employer became subject to or elected to become subject to the provisions of those chapters, if the employee shall not have given the notice and filed it with the director within ten (10) days after the filing by the employer who is subject to or who has elected to become subject to the provisions of those chapters of the written statement as provided; and that waiver shall continue in force for the term of one year, and thereafter, without further act on his or her part, for successive terms of one year each, unless the employee shall at least sixty (60) days prior to the expiration of the first or any succeeding year file with the director a notice in writing to the effect that he or she desires to claim his or her right of action at common law and within ten (10) days thereafter shall give notice thereof to his or her employer."

Legislature," thereby freeing the court to intrude its own preferred policies into the law under the euphemistic banner of "filling in a legislative gap" or "interstitial" lawmaking. "And it is also immaterial that the intrusion [is] in aid of law enforcement. Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States,* 277 U.S. 438, 479, 48 S.Ct. 564, 572–73, 72 L.Ed. 944, 957 (1928) (Brandeis, J., dissenting).

Unlike the WCA (which expressly exempts police officers and firefighters from its coverage), there are no exclusive remedy or waiver provisions in the IOD statute vis-à-vis any party. In particular, neither the municipal employer who provides the benefits indicated nor any of the municipal officers that the majority inoculates against tort claims like this one are immunized from such claims by the terms of the IOD statute. Moreover, notwithstanding Rhode Island's general abrogation of municipal sovereign immunity in 1970, the General Assembly has not seen fit to add any exclusivity or waiver provisions to the IOD statute despite having amended it on numerous occasions thereafter.[8] Indeed, the majority concedes that neither when the IOD statute was first adopted in 1944 nor at any time thereafter has it ever contained any type of exclusivity or waiver provisions such as the ones found in the WCA. Despite knowing how to word such exclusivity and waiver provisions when it wants a benefit scheme to be the only relief available against employers who provide such benefits (as it is for those employees subject to the WCA), the General Assembly has not done so here. Thus, other than wanting to avoid results that run counter to our own judicial notions of what constitutes sound public policy, why then should we be so quick to slam the courthouse doors on these injured public employees when they seek to hold accountable those municipal tortfeasors who are allegedly responsible for their injuries? Merely concluding such a prospect was "not intended by the Legislature" does not make it so, especially when, as here, it is perfectly plausible that the Legislature intended to preserve whatever rights public-safety officers may have or obtain to pursue an independent legal action against governmental wrongdoers. Nor is it realistic for the majority to conjure up apocalyptic visions of conditions "productive of near chaos" when, until the court's decision in this case, tort claims by public-safety officers against governmental wrongdoers have heretofore been allowed to succeed or fail without the exclusivity bar that the majority now interposes for the first time and without having produced any of the "near chaos" that the majority now predicts would occur.

The majority's *ipse dixit* is that, "as with the WCA, the remedy provided for in the IOD statute must be exclusive." But when, as here, sound public policy might also argue against exclusivity and our own constitution directs that "[e]very person within this state ought to find a certain remedy, by having recourse to the laws, for all [personal] injuries or wrongs which may be received," R.I. Const., art. 1, § 5, I am not willing to transmute legislative silence into a public-policy mandate compelling a judicial finding of remedial exclusivity that prevents injured public-safety officers from recovering for all the injuries they have received that are due to the misconduct of governmental tortfeasors. The timeless words of Chief Justice Marshall still ring true down the ages: "Judicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature * * *." *Osborn v. Bank of the United States,* 22 U.S. (9 Wheat.) 738, 866, 6 L.Ed. 204, 234 (1824) (Marshall, C.J.). Nor am I prepared by judicial ukase to convert a benefit scheme for injured police officers and firefighters into an implied forfeiture of these injured workers' fundamental rights—rights that the rest of us enjoy—to obtain redress

---

8. *See* P.L.1972, ch. 212, § 1; P.L.1973, ch. 245, § 1; P.L.1975, ch. 154, § 1; P.L.1976, ch. 167, § 1; P.L.1984, ch. 333, § 1; P.L.1986, ch. 371, § 1; P.L.1987, ch. 527, § 1; P.L.1988, ch. 64, § 1; P.L.1988, ch. 329, § 1; P.L.1990, ch. 419, § 1.

at law for all tortiously inflicted injuries from any and all culpable defendants. *Cf. Kennedy v. Cumberland Engineering Co.*, 471 A.2d 195, 198 (R.I.1984) (finding ten-year statute of repose violative of R.I. Const. art. 1, § 5, because of "total denial of access to the courts for adjudication of a claim"); *Boucher v. Sayeed*, 459 A.2d 87, 93–94 (R.I.1983) (striking down a medical-malpractice statute as unconstitutional because it disadvantaged malpractice plaintiffs as compared to all other litigants in order to favor a special class of health-care-provider defendants).

To assert, as the majority does, that "plaintiff is not precluded by the IOD from bringing suit against the intentional tortfeasor" (that is, against the unidentified assailant who threw the asphalt projectile that struck and injured plaintiff's face and eye) is to blink at the likely ineffectiveness of such a remedy when the identity of this nameless and faceless marauder, one of several hundred people who were present at a gathering of rioting student "satanists," is not only unknown but in all probability unknowable. Moreover, even if this unknown and unidentified suspect could be located, such a culprit is not apt to fit the ideal profile of a deep-pocketed defendant from whom substantial monetary damages for this "intact" remedy can be recovered.

The primary purpose of the Rhode Island Tort Claims Act, G.L.1956 chapter 31 of title 9, "is to provide *effective* relief for persons injured as a result of government negligence." (Emphasis added.) *Catone v. Medberry*, 555 A.2d 328, 333 (R.I.1989). By enacting it, the Rhode Island Legislature "consciously chose to shift the costs of governmental maladministration from innocent victims to the general public via the tax rolls," *id.* at 334, albeit the victim's compensable damages cannot exceed $100,000. Sections 9–31–2, 9–31–3. As applied to public-safety officers, the majority apparently considers this legislative policy to "create a result not intended by the Legislature," but our elected representatives who enacted this law subjecting cities and towns to liability for "*all* actions of tort in the same manner as a private individual or corporation," § 9–31–1, have given us no indication that they

have ever shared this view, much less a license to carve out exceptions to their mandate as it pleases us to do so. (Emphasis added.)

The majority does not advance its position by reminding us that "the Supreme Court of the United States and other courts have resolved the most controversial issues by judicial decision in the face of legislative inaction." Even though the famous United States Supreme Court cases cited by the majority may indeed all be "examples of the forging of [judicial] policy from the magnificent generalities contained in the Bill of Rights," there is no such "magnificent generality" that the majority invokes to reach the result it does in this case. "[S]tatutes are inapplicable unless they either plainly supply a rule of decision or delegate the power to create such a rule" to the courts. Easterbrook, 50 U. Chi. L.Rev. at 549. Here, the Legislature has not delegated to us the responsibility to decide which tort claims by police officers and firefighters should be allowed to proceed to trial and which should be barred at the outset. Moreover, and most ironically, such "magnificent generalities" as pertain to this situation—namely, the aforementioned provisions set forth in article 1, section 5, of our State Constitution—argue in favor of the exact opposite result from that reached by the majority in this case. Accordingly, I am constrained to conclude that the result here is neither "modest" nor "well within the area of a restrained judicial function."

The majority further relies on this court's decision in *Capobianco v. United Wire & Supply Corp.*, 77 R.I. 474, 77 A.2d 534 (1950), as authorizing its policy-making activity in this case. However, unlike the circumstances in *Capobianco*, there is no gap in the legislation at issue here to be filled in to enable judicial review of the underlying factual situation. Indeed, in *Capobianco*, the court said that "*[o]nly* legislative direction to the contrary [can] bar judicial action in the premises." (Emphasis added.) 77 R.I. at 482–83, 77 A.2d at 538. Here, without any legislative direction whatsoever, this court is acting on its own to "bar judicial action in the premises" by preventing public-safety offi-

cers from litigating claims against governmental tortfeasors. Thus, ironically, the majority achieves the very result condemned by this court in *Capobianco,* namely, barring judicial action on the underlying factual situation without any legislative direction to do so.

Accordingly, with no legislative direction to "bar judicial action in the premises" and with our own constitutional guaranty of a certain legal remedy for *all* personal injuries staring us in the face, we have no warrant to take away the remedy of publicly employed police officers and firefighters to recover damages for all their injuries in a tort action against governmental wrongdoers and instead confine them to the limited benefits provided for in § 45–19–1.

The majority also relies on *Labbadia v. State,* 513 A.2d 18 (R.I.1986), but there is nothing there that compels the result reached by the court in this case. It is true the *Labbadia* court concluded that in amending the IOD statute to include crash-rescue crewmembers within its benefit scheme, "the Legislature impliedly excluded crash-rescue crewmembers from the WCA." *Id.* at 22.

> "If this were not so, crash-rescue crewmembers would be entitled to benefits under both the WCA and § 45–19–1. Such a result would be in direct conflict with the exclusivity-of-rights-and-remedies provisions of the WCA and with the clear legislative intent and policy behind the WCA." *Id.*

Here, however, unlike the situation in *Labbadia,* police officers and firefighters have been expressly excluded from the WCA since 1917. *See* P.L.1917, ch. 1534, § 5. Unlike the court in *Labbadia,* we are not faced with a situation in which a governmental employee is attempting to obtain double compensation under two mutually exclusive no-fault benefit schemes. In *Labbadia* the court concluded that "the Legislature has clearly expressed its intent to make the [WCA] statutory edifice the exclusive remedy whenever it is applicable." 513 A.2d at 22. After the Legislature amended the IOD statute to include crash-rescue crewmembers, this court would have been flouting the clear legislative intention to make WCA benefits exclusive for all

those workers who are covered by the WCA if the court had allowed crash-rescue crewmembers like Labbadia to recover double no-fault benefits under both the WCA and the IOD statute.

But *Labbadia*'s reasoning has no application to a situation like the one here where the injured plaintiff is seeking not WCA benefits but recovery on an independent common-law tort action. It is one thing to conclude, as the court did in *Labbadia,* that an injured worker should not be allowed double compensation under both the IOD and the WCA no-fault benefit schemes. But it is quite another to say that in providing benefits under the IOD statute, the Legislature impliedly intended to condition the receipt of such benefits by any public-safety officer with the same sort of exclusivity and waiver provisions that it *expressly* included as part of the WCA but *conspicuously* omitted from the IOD statute.

Moreover, in *Labbadia,* this court acknowledged that the IOD statute "gives police officers, firefighters, and crash-rescue crewmembers *greater* rights than they would have under either [the WCA or] common law (*where, for instance, they would have to show fault on the part of the employer as well as overcome certain defenses*) \* \* \*." (Emphases added.) 513 A.2d at 21. This language acknowledges that although the IOD benefits might bestow "greater" rights in some respects than those that injured police and firefighters would have under common law, such workers do indeed have rights under the post–1970 common law to sue their employers for such injuries, albeit they "have to show fault on the part of the employer" to recover and "overcome certain defenses" that may be available to municipal defendants. Thus, the *Labbadia* decision lends no support to the majority's conclusion that the IOD statute should deprive injured firefighters and police officers of whatever rights they might otherwise have to sue their municipal employers and other alleged governmental tortfeasors for alleged misconduct; indeed *Labbadia*'s dicta point to a contrary result.

None of the above discussion on the putative exclusivity of the IOD-benefit scheme is intended to express an opinion on whether

the plaintiff ultimately should be entitled to recover on his claims against these defendants. Indeed, there may well be a slew of other defenses that would prevent or hamper this plaintiff from ultimately recovering against some of or all these municipal defendants. For example, the plaintiff might be found to have assumed the risk that he would be injured in the manner complained of; there may be contributory or independent intervening causes of his injuries; and either the public-duty doctrine or some variant of qualified immunity may be applicable to insulate some of or all these municipal defendants from the charges made against them. On the other hand, a factfinder could reasonably conclude that the defendants were tortiously culpable in knowingly refusing to equip this particular police officer properly before dispatching him in shirt sleeves to a mob scene with insufficient protective gear to quell a riot, much less to avoid the foreseeable injuries that he sustained while being pelted with bricks and mortar by a klatch of angry satanists. But I would leave these questions to further factual development and, if necessary, ultimate resolution at trial.

For these reasons, I would sustain the appeal, vacate the order granting summary judgment, and remand this case for further proceedings.