Simcha **BERMAN** et al.

v.

**Laura SITRIN, in her capacity as Finance Director for the City of Newport et al.**

No. 2008–74–Appeal.

Supreme Court of Rhode Island.

April 20, 2010.

Kevin P. Gavin, Esq., Portsmouth, Ronald J. Resmini, Esq., Providence, for Plaintiff.

Lauren E. Jones, Esq., Providence, for Newport Preservation Society.

Kathleen M. Daniels, Esq., Providence, for City of Newport.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

Justice GOLDBERG, for the Court.

This case comes before us on appeal by the plaintiffs, Simcha Berman and Sarah Berman from summary judgment entered in the Superior Court in favor of the defendants, The Preservation Society of Newport (Society) and the City of Newport (Newport or city). For the reasons that follow, we affirm the Superior Court's grant of summary judgment for the Society but we vacate the grant of summary judgment for the city.

### Facts and Travel

Once again, this Court finds itself faced with a catastrophic injury that occurred on the Cliff Walk, a major Newport tourist attraction.[1] The Cliff Walk runs along 18,000 feet of Newport's shoreline, high above the rocky Atlantic coast; its majestic cliffs and scenic viewpoints beckon hundreds of thousands of visitors every year. Although the vast majority of these visits result in enjoyable experiences, the situation at bar decidedly did not.

The record establishes that the Cliff Walk is a public easement over private land; a number of individuals and entities, including the Society and Salve Regina University (Salve Regina), own the land over which it runs. It is undisputed, however, that the city has assumed authority and exercises control over the Cliff Walk, both by regulation and maintenance. The city has enacted ordinances restricting access to the Cliff Walk and limiting enjoyment thereon to foot traffic.[2] The city also established the Cliff Walk Commission, an organization responsible for raising money and contracting for the repair and im-

---

**1.** *See Cain v. Johnson,* 755 A.2d 156, 158 (R.I.2000) (recognizing that the decedent died after falling from the Cliff Walk when the ground beneath his feet gave way). Ironically, this Court issued the *Cain* opinion a mere twenty-three days before the incident at bar occurred.

**2.** Newport City Ordinance § 12.32.010(C) restricts public access, requiring that the Cliff Walk "shall be closed for public use between nine p.m. and six a.m. * * * and no person shall go upon such public areas during the hours of closing * * * except that the Cliff Walk shall remain open for the purpose of access to the water for fishing." Newport City Ordinance § 12.32.010(F) prohibits the use of "[b]icycles, motorcycles, skateboards, roller blades, and roller skates of all kinds * * *."

provement on this important coastal attraction.[3] Additionally, the record is replete with evidence of collective efforts by the city and the State of Rhode Island (state) to secure funding for Cliff Walk-related construction and repair.

On August 17, 2000, newly married twenty-three-year-old Simcha (Simcha) Berman[4] and his wife, Sarah, stopped in Newport as part of a belated honeymoon.[5] The couple, from Brooklyn, New York, decided to take a late-afternoon tour of The Breakers, one of the historic mansions in Newport owned and operated by the Society. They paid admission to tour the mansion and the lavishly landscaped grounds. During the tour, the Society's guide pointed out the Cliff Walk, which runs along The Breakers' property, separated by a fence; plaintiffs allege that the guide suggested that, after the tour, the group experience the Cliff Walk. After the tour, plaintiffs first spent some time enjoying the grounds of The Breakers, and then they decided to take an excursion to the Cliff Walk. They exited the fenced-in area of The Breakers through a gate on the north side of the property onto Shepard Avenue, a public street. The plaintiffs followed Shepard Avenue to the portion of the Cliff Walk that runs along the Society's property—an area known as Ochre Point. The plaintiffs allege that there were no signs warning of the Cliff Walk's potential hazards at either The Breakers or the Shepard Avenue entrance.

According to plaintiffs, after they reached the paved portion of the Cliff Walk, the couple noticed a "beaten path," which they assumed would guide them toward the water. Simcha took the lead and proceeded down the path with Sarah close behind. Suddenly, the ground beneath Simcha's feet gave way and he plummeted approximately twenty-nine feet to the rocks below. His injuries were catastrophic; he suffered a severe spinal cord injury that rendered him a quadriplegic.

In 2003, plaintiffs filed this action in the Superior Court, alleging that the Society, Newport, and the state negligently caused Simcha's injuries by failing to properly inspect, maintain, and repair the Cliff Walk and, further, that they knew of its defects and failed to guard or warn against them. In 2005, defendants moved for summary judgment on the ground that Rhode Island's Recreational Use Statute (RUS) immunized them from liability. The original hearing justice denied summary judgment, partly because of perceived ambiguities surrounding the applicability of the RUS to the facts of this case.

Subsequently, in 2007, plaintiffs moved for partial summary judgment seeking to preclude defendants from raising the RUS as a defense. The defendants filed a cross-motion for summary judgment based on the RUS, relying on this Court's recent decisions interpreting its provisions. After a hearing, a second hearing justice denied plaintiffs' motion and the state's motion, but granted summary judgment in favor of both the Society and the city. Judgment

---

**3.** The Cliff Walk Commission (commission) is charged with raising and expending funds for Cliff Walk repairs, improvements, and maintenance. *See* Newport City Ordinance § 2.76.010 (entitled "Creation—Function"). The commission also enacts rules and regulations concerning the Cliff Walk and has "full authority and power to * * * enter into and execute such contracts in relation to the re-

pair, renovation, improvement and maintenance of the Cliff Walk * * *." Newport City Ordinance § 2.76.040 (entitled "Rules and regulations—Limitation on expenditures").

**4.** For clarity's sake, we will hereinafter refer to Simcha and Sarah by their first names.

**5.** The plaintiffs subsequently have divorced.

in favor of the Society and the city subsequently was entered in accordance with Rule 54(b) of the Superior Court Rules of Civil Procedure.

This appeal followed. Further facts will be supplied as necessary.

## Standard of Review

■ It is well established that this Court employs a *de novo* standard to review a hearing justice's decision to grant summary judgment. *National Refrigeration, Inc. v. Standen Contracting Co.,* 942 A.2d 968, 971 (R.I.2008). "We examine the evidence in a light most favorable to the nonmoving party, and we will affirm the judgment if we conclude that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Ouch v. Khea,* 963 A.2d 630, 632 (R.I.2009) (citing *Benaski v. Weinberg,* 899 A.2d 499, 502 (R.I.2006)).

■ Additionally, we review questions of statutory interpretation on a *de novo* basis. *Bucki v. Hawkins,* 914 A.2d 491, 495 (R.I.2007). "It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Accent Store Design, Inc. v. Marathon House, Inc.,* 674 A.2d 1223, 1226 (R.I.1996). Our obligation is to ascertain the legislative intent behind the enactment and give effect to that intent. *Kaya v. Partington,* 681 A.2d 256, 260 (R.I.1996). We are also mindful, however, that "under no circumstances will this Court 'construe a statute to reach an absurd result.'" *Smiler v. Napolitano,* 911 A.2d 1035, 1041 (R.I.2006) (quoting *State v. Menard,* 888 A.2d 57, 60 (R.I.2005)).

■■ Furthermore, this Court can affirm the Superior Court's judgment on grounds other than those relied upon by the trial justice. *State v. Lynch,* 770 A.2d 840, 847 (R.I.2001). Finally, it is well settled that in a negligence action, "[w]hether a duty exists in a particular situation is a question of law to be decided by the court." *Ferreira v. Strack,* 636 A.2d 682, 685 (R.I.1994). Whether the duty has been breached, however, is a question for the fact-finder. *Seide v. State,* 875 A.2d 1259, 1268 (R.I.2005).

## Analysis

### I

### Recreational Use Statute

■ In 1978, the General Assembly enacted the RUS, G.L. 1956 chapter 6 of title 32 (P.L. 1978, ch. 375, § 1), to encourage private landowners to make their land free and open to the public for recreational purposes. *See* § 32–6–1.[6] To accomplish this salutary purpose, the General Assembly declared in pertinent part as follows:

> "[A]n owner of land who either directly or indirectly invites or permits without charge any person to use that property for recreational purposes does not thereby:
>
> "(1) Extend any assurance that the premises are safe for any purpose;
>
> "(2) Confer upon that person the legal status of an invitee or licensee to whom a duty of care is owed; nor
>
> "(3) Assume responsibility for or incur liability for any injury to any person or property caused by an act of omission of that person." Section 32–6–3.

The legislative intent was "to treat those who use private property for recreational purposes as though they were trespassers." *Tantimonico v. Allendale Mutual Insurance Co.,* 637 A.2d 1056, 1060 (R.I. 1994). Thus, landowners who open their

---

**6.** General Laws 1956 § 32–6–1 provides, "[t]he purpose of this chapter is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability to persons entering thereon for those purposes."

land for recreational activities have no duty to the public other than to refrain from willful or wanton conduct. *Id.* at 1061.

 In 1996, the Legislature expanded the term "owners" to include the state and its municipalities.[7] Section 32–6–2(3), as amended by P.L. 1996, ch. 234, § 1. However, and determinatively, we conclude that regarding Newport's duty in this case, the RUS has its limitations. Relevant to our analysis here, § 32–6–5 provides, in relevant part, as follows:

"(a) *Nothing* in this chapter limits *in any way* any liability which, but for this chapter, otherwise exists:

"(1) For the willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity after discovering the user's peril; or

"(2) For any injury suffered in any case where the owner of land charges the person or persons who enter or go on the land for the recreational use thereof * * *." (Emphases added.)

Thus, the Legislature declared that all people who use this state's public recreational resources are classified as trespassers to whom no duty of care is owed, save to refrain from willful or malicious conduct as defined in the RUS.[8] It is that limitation for willful or malicious conduct that controls the result in this case for Newport.

## II

### The Society's Liability

### The RUS and the Society

The trial justice granted summary judgment in favor of the Society, based on her a reasonably safe condition for people who are invited onto the land. *Brindamour v. City of Warwick*, 697 A.2d 1075, 1077 (R.I.1997). However, we also have recognized that this duty does not extend to trespassers—if a person is on the land after hours or in violation of an ordinance or regulation, that person is classified as a trespasser to whom the governmental entity owes no duty, save to refrain from wanton or willful conduct pertaining to the maintenance of the land. *Id.* By its enactment of the RUS, the Legislature has abrogated this latter exception to the judicially created public duty doctrine, and, under the RUS as it stands today, everyone who uses public recreational facilities is classified as a trespasser. Although not necessary to this decision, we are of the opinion that the public duty doctrine and its exceptions are not relevant to the case at bar.

---

7. As we undertake this analysis, we are mindful that Rhode Island's governmental entities enjoy a judicially created immunity known as the public duty doctrine. *See Morales v. Town of Johnston*, 895 A.2d 721, 727–28 (R.I.2006) (recognizing that some governmental operations should be insulated from tort claims). These operations include, but are not limited to, inspecting buildings, undertaking highway construction work, and maintaining traffic signals. *See, e.g., Torres v. Damicis*, 853 A.2d 1233, 1239 (R.I.2004); *DeFusco v. Todesca Forte, Inc.*, 683 A.2d 363, 365 (R.I.1996); *Bierman v. Shookster*, 590 A.2d 402, 403 (R.I. 1991). Over the years, this Court has carved out exceptions to the doctrine, which if applicable, deprive the governmental entity of immunity. *See, e.g., Adams v. Rhode Island Department of Corrections*, 973 A.2d 542, 546 (R.I.2009) (recognizing exception when the governmental entity acts negligently while performing a proprietary function including acting "as a landowner"); *Morales*, 895 A.2d at 730 (recognizing exception when the government owes a special duty to an individual plaintiff); *Verity v. Danti*, 585 A.2d 65, 67 (R.I.1991) (recognizing exception when the governmental entity acts in an egregious manner). We have declared that a governmental entity engaged in a proprietary activity has a duty to maintain its parks and other lands in

8. This Court recently had occasion to comment upon the unfortunately harsh consequences that flow from classifying those who use public recreational facilities as trespassers. *See Lacey v. Reitsma*, 899 A.2d 455, 458 (R.I.2006) (stating that it is the view of this Court "that people who use public recreational facilities should not be classified as trespassers").

conclusion that the Society was the fee owner of the property where the incident occurred, but that it did not charge an admission for entrance onto the Cliff Walk. She further found that there was no evidence in the record "that the Society discovered [p]laintiffs in a position of peril," and therefore the Society was shielded from liability by the RUS. Before this Court, plaintiffs proffer several reasons to support their argument that the RUS does not apply to the facts in this case. As we shall explain in this opinion, it is our conclusion that with or without the protections afforded to landowners by the RUS, the Society does not owe a duty of care to those who enter upon the Cliff Walk. Accordingly, we affirm the grant of summary judgment in favor of the Society, but we do so on grounds other than those relied upon by the hearing justice. *See Lynch*, 770 A.2d at 847 (stating that the Supreme Court may affirm a judgment of the Superior Court on grounds other than those relied upon by the trial court to justify its ruling).

■ However, we shall briefly address the issues that plaintiffs raise to support their contentions that the Society should be answerable in tort in this case. The plaintiffs argue that because the Society charged an admission to The Breakers—which they contend includes a fee to experience the Cliff Walk—the RUS does not apply. The plaintiffs attempt to distinguish the case at bar from the situation in *Hanley v. State*, in which this Court held that the state, as landowner, could invoke the protections of the RUS because the fee it charged the injured plaintiff to park her car did not constitute a fee for admission. *See Hanley v. State*, 837 A.2d 707, 714 (R.I.2003) (recognizing that the state charged patrons for parking, not admission).

The difficulty with this argument becomes clear when one considers the statute's plain language: a "charge" is defined as "the admission price or fee asked *in return for invitation* or *permission to enter* or go upon the land[.]" Section 32–6–2(1) (emphasis added). It is undisputed that plaintiffs paid an admission fee to visit The Breakers mansion and grounds; it is clear that the fee did not include "admission" to the Cliff Walk. If Simcha's injury occurred while he was inside the mansion or in the gated backyard, both areas that required payment of a fee in exchange for permission to enter, then the RUS would be of no assistance to the Society. Simcha's injury, however, occurred outside the area for which he paid an admission fee; it occurred on the public easement. If plaintiffs chose not to visit The Breakers, they nonetheless could have entered the Cliff Walk, free of charge, at Shepard Avenue, or they could have gained access from a number of other points, including the area known as Forty Steps. *See Cain v. Johnson*, 755 A.2d 156, 159 (R.I.2000) (recognizing the Cliff Walk's multiple entrance points). Thus, the fee that plaintiffs paid to tour the mansion and enclosed grounds was not a "charge" to get access to the Cliff Walk as contemplated by the statute.

■ Second, plaintiffs argue that the RUS does not apply because they were the Society's invited guests; this Court previously has determined that the RUS does not apply to a landowner's invited guests. *See Bucki*, 914 A.2d at 497–98. The Cliff Walk, however, is free and open to the public; an invitation to visit is not necessary. The plaintiffs place great emphasis on the fact that The Breakers' tour guide "invited" them to experience the Cliff Walk after the tour and argue that this "invitation" places the Society outside the protections afforded by the RUS. The fact remains, however, that plaintiffs did

not need an invitation of any kind to visit the Cliff Walk. Unlike the private backyard at issue in *Bucki,* the Cliff Walk has all of the attributes of public property—it is a public easement over private land and is open to all for recreational purposes. *See id.* at 498 (recognizing that the backyard was not free and open to the public as evidenced by a "No Trespassing" sign and the landowner's use of specific invitations for entry).

■ Finally, plaintiffs contend that the Society and the city were engaged in a joint enterprise, sufficient to satisfy the limiting language in the RUS with respect to liability for "the willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity after discovering the user's peril[.]" Section 32–6–5(a)(1). After careful review of the record before this Court, we are of the opinion that the defendants were not so engaged, such that each is liable for the negligence of the other, or that a duty on the part of one defendant—the city as we ultimately determine in this case—may be imputed to the Society.

■ The record discloses that in 2005, the original hearing justice observed that there was "some sort of joint venture going on" among the Society, city, and state concerning the Cliff Walk. A joint enterprise requires "such circumstances that each has the authority * * * to act for all in respect to the control of the means or agencies employed to execute such common purpose * * *." *Salmeron v. Nava,* 694 A.2d 709, 712 (R.I.1997) (quoting *Farrar v. Edgewood Yacht Club,* 111 R.I. 376, 380, 302 A.2d 782, 784 (1973)). Despite the hearing justice's rather loose use of the term "joint venture," there is not a scintilla

of evidence in this record suggesting that the Society and the city were involved in a joint enterprise; indeed, the evidence points to a contrary conclusion.

As far back as 1970, in response to a request from the Army Corps of Engineers, the city passed a resolution, giving assurance that the city "will maintain the public easement of passage along the Cliff Walk." *See* Council Resolution No. 12–70; *see also Cain,* 755 A.2d at 169–71 (Goldberg, J., concurring in part and dissenting in part) (discussing the city's maintenance and control over the Cliff Walk). The record also contains evidence of a 1991 letter from the mayor of the City of Newport to the Federal Emergency Management Agency, which stated that "[the state] and the City of Newport admit and acknowledge that one or the other, or both, have the responsibility to supervise and maintain the Cliff Walk." [9]

■ The evidence submitted in this case in no way establishes that the landowners whose property abuts the Cliff Walk, including the Society, agreed or even contemplated acting in such a close relationship with the city (or state) that a joint enterprise is a plausible construction of their relationship. "[T]he mere fact that two persons are doing something together does not make each chargeable with the negligence of the other, nor does the mere fact that they have certain plans in common." *Najjar v. Horovitz,* 54 R.I. 224, 227, 172 A. 255, 256 (1934) (quoting *McGinley v. Winters,* 110 N.J.L. 540, 166 A. 166, 167 (1933)).

Having discussed the issue of the availability of the RUS to the Society, we turn now to the penultimate issue of what, if any, is the duty of care owed by the Soci-

---

9. The letter was also signed by the then-governor of Rhode Island. We note that the state also may share control and thus responsibility for the maintenance of the Cliff Walk; that question, however, is not before us.

ety to the multitude of tourists who annually visit the Cliff Walk.

### Whether the Society owed a Duty of Care to Plaintiffs

■ To prevail on a claim of negligence, it is incumbent upon Simcha to establish that the Society owed him a legal duty, the Society breached that duty of care, and he suffered injury as a result. *See Haley v. Town of Lincoln,* 611 A.2d 845, 848 (R.I.1992) (noting that a prima facie case of negligence requires proof of a legal duty owed by defendant, "the breach of which serves as the basis of liability"). The record demonstrates that the Cliff Walk is a public easement over private land; a number of private individuals and entities including the Society and Salve Regina own the land along which the Cliff Walk runs. It is a well established legal principle in this jurisdiction, as well as others, that a landowner whose property abuts a public way has no duty to repair or maintain it. Typically, courts will not impose liability for injuries that occur on land over which the owner has no control, and significantly, no duty to repair. "Whether a duty exists in a particular situation is a question of law to be decided by the court." *Ferreira,* 636 A.2d at 685. It is our opinion that because the Society has no control over the public easement, it has no responsibility to those who come upon it.

Our decision in *Ferreira* is instructive; the tragic events in that case occurred on Christmas Eve in 1986, when three church parishioners, returning to their car after Midnight Mass, crossed Broadway, a public street in Newport, to travel from the church to a small parking lot owned by a third party. *Ferreira,* 636 A.2d at 684. While crossing the street, two of the wor-

shipers were struck by a drunk driver; one parishioner suffered severe injuries and the other died. *Id.* The plaintiffs sued the church, but this Court rejected the contention that the church was responsible for their injuries. *Id.* at 686. We noted that "the protection of the public while on a public way is a duty allocated to the government, not to private individuals who own land abutting public ways." *Id.* The plaintiffs additionally argued that, because the church knew that its worshipers customarily crossed the public way to attend services, injuries such as the ones suffered by the plaintiffs were foreseeable. *Id.* at 688. We declared, however, that because "a landowner neither owns nor controls a public way," the church could not be liable for failing to prevent the injury, even if such injury was foreseeable. *Id.* (noting that Rhode Island law consistently recognizes that the foreseeability of an injury does not impose a duty); *see also Cornell v. Jan Co. Central Inc.,* 671 A.2d 1223, 1224–25 (R.I.1996) (holding that an abutting corporate landowner did not have a duty to control or manage traffic on an abutting public way).

Other jurisdictions are in accord. Recently, the North Dakota Supreme Court declined to hold a landowner responsible for injuries occurring on a public way that ran through his property. *Kappenman v. Klipfel* 765 N.W.2d 716, 728 (N.D.2009). A thirteen-year-old boy died when his all-terrain vehicle fell into a trench that crossed a town section line,[10] which ran through private property. *Id.* at 718. The defendant owned land on both sides of the line. *Id.* at 719. The court stated that "[a]lthough the landowner abutting a section line continues to own the land subject to the easement * * * [he] does not owe to

---

**10.** Section lines are "considered public roads open for public travel." *Kappenman v. Klip-*

*fel,* 765 N.W.2d 716, 720 (N.D.2009) (quoting N.D.C.C. § 24–07–03).

the public a duty to keep the [easement] in a safe condition." *Id.* at 728.

Additionally, the New York Court of Appeals rejected an argument that a baseball stadium was liable for injuries that a fourteen-year-old boy suffered after a drunk driver struck him while he was chasing a foul ball into the public street adjacent to the stadium. *Haymon v. Pettit,* 9 N.Y.3d 324, 849 N.Y.S.2d 872, 880 N.E.2d 416, 417 (2007). The stadium sponsored an incentive program in which members of the public who gathered outside the building would receive free tickets in exchange for retrieving and returning foul balls. *Id.* The plaintiff argued that since this type of an injury was a consequence of the stadium's incentive program, it owed the public a duty of protection. *Id.* The court held that the plaintiff's argument presupposed that a duty existed, but the court declined to impose such a duty because the stadium "could control neither the public street nor third persons who use it." *Id.* 849 N.Y.S.2d 872, 880 N.E.2d at 418; *see also Lacey v. Bekaert Steel Wire Corp.,* 799 F.2d 434, 437 (8th Cir.1986) (observing that, under Arkansas law, the defendant who owned property under and adjacent to the public highway did not owe a duty to travelers); *Davis v. Westwood Group,* 420 Mass. 739, 652 N.E.2d 567, 571 (1995) (noting that the state's control over the public way undermined the plaintiff's attempt to impose liability on the abutting private landowner).

It is not the function of this Court to declare a duty when none exists. Although the Society owns the land over and along which the public easement runs, it has no control over the Cliff Walk; it cannot restrict or limit access to the ease-ment by the hordes of tourists who visit it each year.

■ The law in this state, as well as in other jurisdictions, is clear: a public easement is the responsibility of the governmental agency that undertakes the control and maintenance of the easement. Whether a private abutter owns the land running under the easement is of no moment; nor does it matter that the risk of injury from the easement's use is foreseeable. We are of the opinion that landowners whose property abuts the Cliff Walk, including the Society, do not have a duty of care to maintain the easement. These landowners have no duty to warn, construct fences, or take any other precautions concerning the attraction's dangers. Because there is no duty owed by the Society, we affirm the grant of summary judgment, but we do so on grounds other than those relied upon by the trial justice. *See Lynch,* 770 A.2d at 847.

### III

#### City of Newport's Liability

As previously stated, the RUS accords a member of the public the status of a trespasser, qualified only by the landowner's responsibility to refrain from "willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity after discovering the user's peril[.]" Section 32–6–5(a)(1). The city contends that it has no duty to maintain the Cliff Walk or to warn visitors of its known hazards unless a city employee, perhaps by happenstance, is present on the Cliff Walk and fails to warn a visitor—such as plaintiff—who is approaching danger.[11] Although this may be a plausible argument based on our previous cases in which we touched upon § 32–6–5(a)(1), this argu-

---

11. The city makes this argument in response to plaintiffs' contention that the Society's em-ployees' alleged negligence could be imputed to the city.

ment must fail in the face of the facts and the instrumentality at issue in this case.

■ It is a well settled principle of our law that this Court will not interpret a statute literally when doing so would lead to an absurd result, or one that is at odds with legislative intent. *See Raso v. Wall,* 884 A.2d 391, 395 n. 11 (R.I.2005) (recognizing that the plain meaning approach to statutory construction is not to be adhered to when it would lead to an absurd result) (citing *State v. Santos,* 870 A.2d 1029 (R.I. 2005)). This Court always will strive to adopt a construction of a statute that avoids an absurd or unjust result. *Id.* (citing *Berthiaume v. School Committee of Woonsocket,* 121 R.I. 243, 247, 397 A.2d 889, 892 (1979)).

Under the RUS, a landowner enjoys immunity from ordinary negligence unless the landowner engages in behavior that falls within the exceptions set forth in the statute. It is the exception set forth in § 32–6–5(a)(1) that is relevant to this case; that is, liability is not limited in any way "[f]or the willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity after discovering the user's peril[.]" Essentially this is a two-part test. It remains for the fact-finder to determine whether the city engaged in a willful or malicious failure to warn or guard against a known danger. However, it is the last phrase—"after discovering the user's peril"—that requires our analysis and leads us to conclude that applying the term literally is unreasonable and would render the exception meaningless in the context of this case. Accordingly, we shall address the phrases separately, and we shall analyze the more troublesome phrase first.

### Discovering the User's Peril

■ The record before us is replete with evidence that the city, for some time, has known about the Cliff Walk's latent dangers, including the eroding cliff edge, the drainage defects, and the fact that rainwater runoff "creates what seems to be paths along the Cliff Walk."[12] Additionally, the record indicates that the city knew "most users of the Cliff Walk would like to get as close to the water as possible, [and] they might mistake these erosion trails as foot paths."[13] Tragically, the record suggests that even in the face of several fatal or near fatal incidents, the city has failed to either guard against these dangers or post warnings.

According to the record before us, this does not appear to be a case in which a visitor came too close to the edge of a cliff and fell off, as tragic as that would be. As alleged in this case, however, the events leading to Simcha's tragic injury were caused by latent defects in the structure of the Cliff Walk that are not obvious to the occasional visitor. The alleged facts in this case bear a haunting similarity to the plight of Michael Cain, who died in 1991 from injuries that he suffered during a visit to the Cliff Walk. *See Cain,* 755 A.2d at 158. The record in that case established that when Cain stepped from the paved area onto a "well-worn spot * * * that appear[ed] to be a perfectly natural area for a stroller to stop * * * and look[ed] out over the Atlantic Ocean," he fell to his death, *"after the ground beneath his feet gave way." Id.* at 158, 168 (Goldberg, J., concurring in part and dissenting in part) (emphasis added). Nine years later, almost to the day, plaintiffs allege that Simcha stepped off the Cliff Walk's pavement, onto what appeared to

---

**12.** 2001 Annual Report of the Cliff Walk Commission.

**13.** *See* note 12, *supra.*

his untrained eye to be a well-worn, grassy path when, as he contends, the "ground gave way" beneath his feet and he plunged to the rocks below.

The city contends that it did not have a duty to warn against this danger because neither the city nor the Society observed Simcha before his fateful descent. According to the city, Simcha was not in a perilous position until he ventured off the paved walkway and attempted to walk down to the water over an area that he says he mistook for a path and which, allegedly, had been eroded by runoff. The city argues that it has no duty to guard against the latent dangers on the Cliff Walk. The city contends that for a duty to exist in this case would mean that "*all* visitors to the Cliff Walk * * * would be owed a duty to be free from willful and wanton conduct as soon as they enter upon the land" and that, if that were the case, "the user does not need to be *discovered* in peril by the owner" because the city's "mere knowledge that the land has a perilous condition is sufficient." We are of the opinion that the city's argument is based on an overly narrow reading of the statutory language and that such a reading would lead to an absurd and blatantly unjust result.

The city argues that a user of recreational land cannot be discovered in a position of peril until the owner (in this case, a city employee) actually perceives the person approaching a known danger. The term "discovery" means the "process of finding or learning something that was previously unknown." Black's Law Dictionary 533 (9th ed. 2009). However, at the time of Simcha's injury, the dangers surrounding the Cliff Walk were anything but "unknown," and tragedies such as this have occurred on multiple occasions. It is beyond dispute that for many years, the city has had actual notice of the dangerous instability of the ground underneath the Cliff Walk and its eroding edge.

Indeed, the record before us is replete with evidence demonstrating that long before the Cain tragedy, the city knew that the forces of natural erosion were taking a toll on the Cliff Walk. In 1983, and again in 1987, after Brian Putney, a Salve Regina student, fell to his death from the Cliff Walk, Sister Lucille McKillop, the college's then-president, wrote to Newport's city manager expressing her concerns about the attraction. She conveyed her "concern for the safety of travelers because the entire under support structure of [the] area is so weak." Sister Lucille twice requested that the city install fencing around Shepard Avenue—the very point where plaintiff at bar accessed the Cliff Walk—"to delineate those points beyond which it is unsafe to pass." In July 1989, the North Atlantic Regional Office of the National Park Service reported that the Cliff Walk was in desperate need of repair. *Cain,* 755 A.2d at 167 (Goldberg, J., concurring in part and dissenting in part). The report suggested that three years before Cain's death in 1991, the United States Army Corps of Engineers and the USDA Soil Conservation Service "indicated a serious level of hazard to Cliff Walk visitors." *Id.* Additionally, a 1991 memorandum from the City of Newport recognized that "[t]he Soil Conservation Service has identified seven critical areas where immediate action is needed to maintain a safe treadway for pedestrians on the Cliff Walk." Accordingly, the evidence produced in this case demonstrates that the city had actual or constructive knowledge of the perilous circumstances, and, having been afforded a reasonable amount of time to eliminate the dangerous condition, failed to do so. This failure places the members of the public whom the city invites to visit the Cliff Walk in a position of peril.

In *Smiler*, 911 A.2d at 1041, this Court discussed the "discovery" language of the RUS, and we declared that "[i]t would be absurd to conclude that the Legislature would require a landowner to sit idly by and wait until peril arose before a duty to warn the individual attached." *Smiler* involved a woman who fell after she was attacked by a swarm of bees at a Providence park. *Id.* at 1037. We held that the RUS was a bar to liability because Providence did not know of the presence of the bees and thus had not yet discovered the plaintiff's peril. *Id.* at 1037–38, 1041. "It is clear to this Court that the city's duty would arise at the point when a city employee discovered that [the visitor] was approaching an *area where there was a known risk* of bees." *Id.* at 1041 (emphasis added). We also emphasize that we are not confronted with a single injury in a given location, such as the plaintiff in *Smiler*, who fell while running from a swarm of bees; or the nine-year-old boy in *Lacey v. Reitsma*, 899 A.2d 455, 456 (R.I. 2006), who was injured at Fort Adams State Park in Newport, when his bicycle "veered over the cliff and fell to the rocks below, sustaining severe and permanent injuries." In *Lacey*, the parents of the injured child filed suit against the state, alleging negligence for failure "to place a guard-rail, wall, fence, or other protective device along the road to prevent people from falling off the cliff." *Id.* In both of the aforementioned cases, there was no evidence that the governmental entity knew of the danger and then failed to take any action to guard against it, such that additional tragic injuries continued to occur.

It is because of the multiple incidents of death and grievous injury that we conclude that the city may not successfully defend this claim based on an assertion that it had no specific knowledge of Simcha or any peril confronting him. Hundreds of thousands of people annually visit the Cliff Walk, an area in which there is a known risk of death or serious injury to unsuspecting visitors who might innocently venture off the paved path. We reject the city's argument that it does not have a duty to guard or warn against these known perils simply because a city employee did not literally discover Simcha's peril.[14] In our opinion, the city had an affirmative duty to take reasonable steps to warn and shield unsuspecting visitors, such as the Bermans, against these known and grave dangers in some reasonable manner. To construe the RUS otherwise would not only lead to an absurd result, but it would also render the exception nugatory.

Furthermore, and most significantly, in the face of these multiple tragedies, we cannot conclude that when the Legislature extended the protection of the RUS to the state and its municipalities, it intended to relieve the city from any responsibility whatsoever to the many tourists who visit the Cliff Walk. Were we to interpret the statute in the manner that the city suggests, our holding would serve as a disincentive to the state and its subdivisions to make necessary safety repairs to publicly owned and taxpayer-financed recreational facilities, or to warn the unsuspecting and innocent members of the public of known dangerous conditions. We emphasize that it is the number of serious injuries flowing from a known risk that brings us to this conclusion today.

### Willful or Malicious Failure to Guard or Warn

■ The statutory terminology "willful or malicious failure to guard or warn

---

14. As we shall discuss *infra*, the term "guard" means to take precautions and "[t]o protect from harm or danger, esp[ecially] by careful watching; * * * [t]o take precautions[.]" American Heritage Dictionary 580 (2nd ed. 1985).

against a dangerous condition, use, structure, or activity" has not previously been addressed by this Court. However, the plain and ordinary meaning of this statute's language, as well as the persuasive case law from our sister states interpreting their own recreational use statutes, work in tandem to convince us that the law imposes a duty upon the city in this case, and the city is precluded from invoking the RUS as a shield against liability for Simcha's injuries.

The protections afforded by the RUS are not available when there has been a "willful or malicious failure to guard or warn against a dangerous condition." Section 32–6–5(a)(1). Black's Law Dictionary defines "willful" as "[v]oluntary and intentional," Black's Law Dictionary 1737 (9th ed. 2009) and "malicious" as "[s]ubstantially certain to cause injury."[15] *Id.* at 1043. The term "guard" means "[t]o protect from harm or danger, esp[ecially] by careful watching; * * * [t]o take precautions[.]" American Heritage Dictionary 580 (2nd ed. 1985). A "warning" is defined as "[t]he pointing out of a danger, esp[ecially] to one who would not otherwise be aware of it." Black's Law Dictionary 1722 (9th ed. 2009).

In this case, a fact-finder reasonably could find that after learning about the Cliff Walk's instability, particularly along the area of Ochre Point, the city voluntarily and intentionally failed to guard against the dangerous condition, knowing that there existed a strong likelihood that a visitor to the Cliff Walk would suffer serious injury or death. The statutes and case law from our sister states are consistent with our conclusion. Georgia's Recreational Property Act's language mirrors ours in this respect. *See* Ga.Code Ann. § 51–3–25(1) (West 2009) (limiting liability

unless evidence of "willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity"). The Court of Appeals of Georgia in *Quick v. Stone Mountain Memorial Association,* 204 Ga.App. 598, 420 S.E.2d 36 (1992), allowed the landowner to limit its liability even when it did nothing to prevent injuries sustained by the plaintiff who tripped and fell over rocks in a public park. *Id.* at 38. The court indicated that:

> "[a] wilful [*sic* ] failure to guard or warn would require actual knowledge * * * that a condition exists involving an unreasonable risk of death or serious bodily harm; that the condition is not apparent to those using the property; and that having this knowledge, the owner chooses not to guard or warn, in disregard of the possible consequences." *Id.* (quoting *Georgia Marble Co. v. Warren,* 183 Ga.App. 866, 360 S.E.2d 286 (1987)).

The court concluded that the unpaved area at issue in *Quick,* although covered in wood chips and hidden rocks, did not constitute a condition involving an unreasonable risk of death or serious bodily injury. *Quick,* 420 S.E.2d at 38. Importantly, the court noted that the park officials "were *unaware of any other accidents that had occurred in this area.*" *Id.* (emphasis added).

Similarly, the United States Court of Appeals for the Seventh Circuit, applying the Illinois Recreational Use of Land and Water Areas Act, declined to hold the landowner responsible for injuries that occurred when the plaintiffs drove their all-terrain vehicles into a creek bed. *Cacia v. Norfolk & Western Railway Co.,* 290 F.3d 914, 915, 917 (7th Cir.2002). The court noted that, if the defendant "has been informed of a dangerous condition or was

---

**15.** We note that the term "malicious" in this context does not relate to the traditional, common law concept of malice or malice aforethought in homicide cases.

aware of the fact that others had been injured because of the condition, and failed to respond to or otherwise remedy the dangerous condition[,]" liability would attach. *Id.* at 920. With that in mind, the court noted that the "plaintiffs point to not an iota of evidence that suggests that [the landowner] had *any knowledge* that the barricade * * * was damaged" (emphasis in original) and that the "evidence is undisputed that [the landowner] *had no knowledge* of any other complaints or accidents at the site * * *." *Id.* (emphasis added).

Quite appropriately, Newport jealously guards and promotes the Cliff Walk as a cornerstone of its tourism industry—an attraction that annually lures legions of visitors to the Atlantic coast. Newport has received more than $3.5 million in federal, state, and municipal funding for the Cliff Walk, and, to qualify for this money, the city declared its sovereignty over it. The city assumed control of the Cliff Walk, fully aware of the threatened stability of the walkway. However, at the same time, the city boldly argues that it has no duty to maintain the Cliff Walk or warn visitors about its latent dangers, and the city contends that it is immune from suit unless a city employee, by happenstance, is present on the Cliff Walk and fails to warn a visitor whom he sees approaching the unstable cliff edge. We reject these contentions.

■ We recognize that for purposes of tort liability under the RUS, a visitor to the Cliff Walk is accorded the status of a trespasser to whom no duty of care is owed, save to refrain from the conduct set forth in § 32–6–5(a)(1). But we are equally cognizant that if we were to apply the language of § 32–6–5(a)(1) as argued by the city, the throngs of visitors, who, although accorded the status of trespassers,

are nonetheless innocent tourists, will continue to face grave danger based on an interpretation of the RUS that is not only absurd, but unjust. We are not persuaded that the Legislature intended the RUS to serve as an invitation to ignore known hazards while profiting from this major tourist attraction where such danger is present. We simply decline to attribute such intent to the Legislature.

This Court is not the finder of fact. It is our function to rule on the question of law presented in this case. Having declared that the immunity provided by the RUS is not available to defendant City of Newport, in the context of the Cliff Walk, the question of whether the city is liable in tort is a task that is committed to the factfinder.[16]

### Conclusion

For the foregoing reasons, we conclude that the defendant Preservation Society of Newport did not owe a duty of care to the plaintiffs in this case. Accordingly, we affirm the Superior Court's grant of summary judgment in its favor; but we do so on grounds other than those relied upon by the trial justice.

Additionally, for the reasons stated in this opinion, we hold that the defendant City of Newport may not invoke the limited protections of the RUS because the city had a duty to warn or guard against the Cliff Walk's latent dangerous condition. Accordingly, we vacate the Superior Court's grant of summary judgment and remand the case for trial.

FLAHERTY, J., concurring.

I completely concur in Justice Goldberg's well-written opinion that the Recreational Use Statute, G.L. 1956 chapter 6 of title 32, effectively bars suit in this

---

**16.** Obviously, the city is free to invoke all traditional tort-based defenses.

case against the Preservation Society of Newport but does not do so against the City of Newport. To hold otherwise would require this Court to embrace a conclusion that the landowner, saturated with the knowledge that some feature of his land presents a clear and present danger to completely innocent users, simply could adopt a "see no evil, hear no evil, speak no evil" attitude and use the statute as a shield from liability. I cannot begin to conceive that the General Assembly had any such intent; to conclude otherwise would be beyond absurd. *See Ellis v. Rhode Island Public Transit Authority,* 586 A.2d 1055, 1057 (R.I.1991) ("[E]ven in circumstances in which a statute is clear and unambiguous, a statute will not be interpreted literally when such a construction will lead to an absurd result or one at odds with the legislative intent."); *Sugarman v. Lewis,* 488 A.2d 709, 711 (R.I.1985) ("A statute should not be interpreted literally, however, even though clear and unambiguous, when such a construction will lead to a result at odds with the legislative intent."); *Kingsley v. Miller,* 120 R.I. 372, 376, 388 A.2d 357, 360 (1978) ("[A] literal reading of a statute may be ignored if it does not convey a sensible meaning or where it defeats an evident legislative purpose."). A contrary holding in this case would provide an incentive to landowners to be callous and altogether irresponsible with respect to the safety of people entering upon their land for simple recreational pleasure, in the face of danger known to the owner, but of which the recreational user is totally unaware.

SUTTELL, C.J., with whom ROBINSON, J., joins, concurring in part and dissenting in part.

We concur with the majority's conclusion that the Preservation Society of Newport did not owe a duty of care to the plaintiff in this case, and we join in the majority's analysis relative thereto. We dissent, however, from Section III of the majority opinion, which holds that, in this case, the City of Newport will not be immune from suit pursuant to the Recreational Use Statute (RUS). While we certainly have genuine sympathy for the plaintiffs, we believe that the majority's analysis in Section III cannot be squared with the language of the statute or with our settled jurisprudence.

As the majority explains, the RUS relegates a nonpaying user of private or public lands for recreational purposes to the status of that of trespasser, to whom a minimal duty of care is owed at common law. *See generally Tantimonico v. Allendale Mutual Insurance Co.,* 637 A.2d 1056, 1057 (R.I.1994). A landowner's immunity afforded by the RUS is specifically circumscribed by the provisions of G.L.1956 § 32–6–5, which state in relevant part:

"(a) Nothing in this chapter limits in any way any liability which, but for this chapter, otherwise exists:

"(1) For the willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity *after discovering the user's peril * * *.*" (Emphasis added.)

In commenting on this statutory language, this Court has said that "[t]his rule is simply a legislative codification of the common law that is enunciated in our cases." *Cain v. Johnson,* 755 A.2d 156, 164 (R.I. 2000).

This Court in *Cain* explicated the common-law rule: "Under Rhode Island law it is well settled that a landowner owes a trespasser no duty except to refrain from willful or wanton conduct. * * * It is also well settled that such a duty arises only after a trespasser is discovered in a position of danger." *Cain,* 755 A.2d at 160. The Court in *Cain* also discussed *Zoubra*

*v. New York, New Haven and Hartford Railroad Co.*, 89 R.I. 41, 150 A.2d 643 (1959), which involved a plaintiff who was injured at a railroad crossing. In *Cain*, this Court explained, citing *Zoubra*, 89 R.I. at 45, 150 A.2d at 645, that "the law does not impose upon a landowner any duty toward a trespasser unless it has first discovered *him* or *her* in a position of peril, even though there was an allegation that the defendant knew or should have known of the presence of people on the crossing." *Cain*, 755 A.2d at 161. The *Cain* majority additionally noted that this Court has not accepted the "beaten path exception," available under the common law of some jurisdictions, pursuant to which a landowner is liable to a trespasser injured while using a limited area containing an unreasonable risk of harm. *Id.* "This theory * * * turns on a landowner's knowledge of the use of his [or her] land by trespassers" and does not require that the landowner observe the particular trespasser on his or her property. *Id.* Rather, "this Court has steadfastly held that a landowner owes a trespasser no duty until he or she is actually discovered in a position of peril." *Id.*

In subsequent cases, the Court repeatedly has held that the "willful or malicious" exception to statutory immunity under the RUS applies only after the landowner discovers a particular user in a position of peril. *See Smiler v. Napolitano*, 911 A.2d 1035, 1041 (R.I.2006) (recognizing that "the city's duty would arise at the point when a city employee discovered that Irina was approaching an area where there was a known risk * * * "); *Lacey v. Reitsma*, 899 A.2d 455, 458 (R.I.2006) (holding the state to be immune where there was "no evidence that [the] defendants discovered young R.J. in a position of peril and then failed to warn him against the potentially dangerous condition").

We respectfully assert that the majority's analysis is at odds with the unambiguous language of the statute and our settled jurisprudence. *See Lacey*, 899 A.2d at 458 (describing the language of the RUS as "unambiguous" and noting the "equally unambiguous nature of the relevant precedent"). In the instant case, a duty on the part of the city would have arisen only if an employee of the city had discovered Mr. Berman approaching an area where there was a known risk of danger and, thereafter, that employee willfully or maliciously failed to guard or warn him against the danger. *See Smiler*, 911 A.2d at 1041; *see also Lacey*, 899 A.2d at 458; *Cain*, 755 A.2d at 164. The plaintiffs allege no such wrongdoing by any agent of the city; and, in our judgment, general knowledge that recreational property has some dangerous element is not enough to give rise to a duty under the statute. *See Smiler*, 911 A.2d at 1038–39.

The gravity of Mr. Berman's injuries cannot be understated. Further, it is undisputed that the city is aware of other catastrophic injuries that have occurred on the Cliff Walk, yet it has failed to take even the simple expedient of posting warning signs at all entrance points to what it actively promotes as a prime tourist attraction. This is likely because the RUS not only protects the city from liability but also acts as a disincentive for the city to implement any safety measures whatsoever.

In 1996, the RUS was amended to specifically include the state and municipalities within the definition of a landowner to whom the statute applies. Since that time, we have on several occasions exhorted the General Assembly to revisit the provisions of the RUS, "especially where *public* parks and similar *public* recreational areas are concerned." *Lacey*, 899 A.2d at 458; *see*

*also Smiler,* 911 A.2d at 1042. In *Lacey,* 899 A.2d at 458, we stated "respectfully, but forcefully * * * that we find it troubling (to say the least) to be confronted with a legal regime" in which no duty of care exists for users of state and municipal recreational sites.

If ever there was a case to which one could apply the ancient maxim "Dura lex sed lex" ("The law is hard but it is the law"), it surely would be this case. Nevertheless, as this Court unanimously stated in the recent case of *DeSantis v. Prelle,* 891 A.2d 873, 881 (R.I.2006), "[i]t is not for this Court to assume a legislative function when the General Assembly chooses to remain silent." The venerable concepts of tripartite government dictate that "[t]he remedy for a harsh law is not in interpretation, but in amendment or repeal." *State v. Duggan,* 15 R.I. 403, 409, 6 A. 787, 788 (1886).[17]

We must decline "to substitute our will for that of a body democratically elected by the citizens of this state * * *." *DeSantis,* 891 A.2d at 881. Although we are sympathetic with the majority's desire to deny the protections of the RUS to the city in this case, we feel compelled to dissent from the majority's departure both from what we consider to be clear statutory language and clear precedent. At the same time, we once again urge the General Assembly to address the scope of the statute.

---

17. "This Court * * * is not 'entitled to write into the statute certain provisions of policy which the [L]egislature might have provided but has seen fit to omit * * * * * * if a change in that respect is desirable, it is for the [L]egislature and not for the [C]ourt.'" *Simeone v. Charron,* 762 A.2d 442, 448 (R.I. 2000) (quoting *Elder v. Elder,* 84 R.I. 13, 22, 120 A.2d 815, 820 (1956)).